# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

**Civil Action No.**

CHARLES ALFRED ARMAJO JR;
On behalf of other Native American Adherents' similarly situated in WDOC's custody;

Plaintiffs,

v.

WYOMING DEPARTMENT OF CORRECTIONS;                    **25-cv-00071**
WYOMING MEDIUM CORRECTIONAL INSTITUTION;
DIRECTOR DANIEL SHANNON, in his individual and official capacity;
WARDEN SETH NORRIS, in his individual and official capacity;
LANDEN SANDERS, in his individual and official capacity;

**(State Claim No: 080-EO-24-0012878)**                    Defendants.

---

## COMPLAINT / MEMORANDUM & JURY DEMAND

Plaintiffs, by and through *pro se* allege as follows:

**1.** This action arises out of the unconstitutional and unlawful practices at the Wyoming Medium Correctional Institution ("WMCI") in Torrington, Wyoming with respect to the Plaintiff whom is a current resident: Charles Alfred Armajo Jr. ("Armajo"), (the "Plaintiff").

**2.** WMCI is a state-run correctional facility governed by the Wyoming Department of Corrections ("WDOC"). In Wyoming WDOC certifies approved placements, at WMCI or other facilities, as safe and appropriate placements for Adult Male inmates' as well Female inmates. As a result, WMCI houses male and female Inmates between the ages of eighteen to a hundred years old who have complex needs. Adult inmates are sent to the WMCI after they have been adjudicated of a crime within the state of Wyoming or housed there due to protective custody housing of out of state inmates. "Convicted persons" by Wyoming State courts who places them in the State's custody. The majority of the WMCI's[1] residents suffer from some form of mental illness for which there is a compelling need for Native American Ceremonial Healing and Treatment. In many cases such as with the Plaintiff a "***HOLY MAN***" is a Native American

---

[1] As noted: WMCI is considered housing, hospital for the sick and afflicted or undesirables by society in general.

Religious Practitioner who uses the "Sacred Ceremonial Property" to help with healing the sick and afflicted male adherents here at WMCI who have mental illnesses, as well as sicknesses that are severe, and their mental health needs are highly complex. Many adherents also suffer from significant trauma contributing to their need for Native American Ceremonial healing and therapeutic services.

3. While WMCI touts itself as a place where the Inmate population within "The Wyoming Department of Corrections contributes to public safety by exercising reasonable, safe, secure and humane management, while actively providing offenders opportunities to become law-abiding citizens." Nothing could be further from the truth.

4. As WMCI claims to have these "Core Values", these values state as such: "We, the management and staff of the Wyoming Department of Corrections, express the following Core Values which are built around our commitment to public safety and offender rehabilitation, and will guide our performance in carrying out our mission and pursuing our vision as a benchmark correctional system: (1) We recognize the importance of our staff as being the Department of Corrections' strength, and major resource, in achieving our objectives and commit to the continued training, recognition and retention of staff. (2) We recognize that human relationships, which are principled, ethical and reasonable, are the cornerstone of our commitment to our mission. (3) We recognize that the offender has the potential to live as a law-abiding citizen, and we encourage them to assume responsibility for their actions. (4) We are committed to developing partnerships throughout our communities to include victims, relevant groups, the public, and private agencies. (5) We recognize the importance of the community, the victim, and the offender's role in a successful criminal justice system. These partnerships are essential to the achievement of our mission."[2] To address these types of complex behavioral issues common to residents at WMCI, Native American Spiritual needs must be kept. Despite the Regulations that impinge on an inmate's constitutional rights will be upheld only if they are reasonably related to legitimate penological interests. Although, some Courts generally say that Regulations that impinge on an inmate's constitutional rights will be upheld only if they are reasonably related to legitimate penological interests.

5. The mission statement to the staff at WMCI also states impart: (1) "Individuals working together to deliver quality services with professionalism and integrity to our customers,

---

[2] (See WDOC Policy #1.002, Management Philosophy - Mission, Vision, and Core Values.)

employees, and offenders." And required **(2)** Core Values: **(i)** Exceed Expectations; **(ii)** Promote Human Dignity, Fairness, and Self Worth; **(iii)** Live the Golden Rule; **(iv)** Be Fiscally Responsible; **(v)** Expect Mutual Accountability – T.E.A.M. (Together Everyone Accomplishes More) and; **(vi)** Balance Risk against Rewards; **(3)** WMCI will proactively manage its offender population to ensure the safety and security of the public. **(4)** WMCI will manage the correctional facility in compliance with current industry standards in order to maintain a clean, safe and secure institutional environment for staff, volunteers, visitors, and inmates. **(5)** WMCI will promote professionalism of staff by providing an environment that fosters their safety, performance, and professional growth. WMCI will foster and develop the role of staff as models for professional and ethical behavior **(6)** WMCI will perform initial admissions, classification, medical and mental health diagnostic functions, and educational assessments for all male inmates sentenced to the Department of Corrections, with the exception of inmates who have been sentenced to death. **(7)** WMCI will serve as the medical and mental health care center for eligible inmates in need of long-term services, specialized treatment, or supportive living. **(8)** WMCI will continuously seek opportunities for expanding the involvement of the community, victims and private agencies in improving the effectiveness of services." *Id.*

**6.** The next crucial information the Defendants blatantly ignored is their "Leadership Expectations Senior Leadership, as well as all supervisory staff are expected to mentor, train, and role model the following concepts to all WMCI staff members: **(1)** *Inmates are sent to prison as punishment not for punishment.* **(2)** *Correctional staff has a responsibility to ensure that inmates are returned to the community with less anger or hostility than when they were committed.* **(3)** Inmates are entitled to a safe and humane environment while in prison. **(4)** We must believe in an individual's capacity to change his/her behavior. **(5)** *We must normalize the environment to the extent possible by providing programs, services and incentives.* **The denial of such must be related to maintaining order and security rather than punishment.** **(6)** Most inmates will respond favorably to a clean and aesthetically pleasing physical environment and will not vandalize or destroy it. **(7)** *We do not treat all inmates alike any more than we treat all people in the "free world" alike. We must be sensitive to personality differences, cultural backgrounds, lifestyles and educational levels, and treat inmates as individuals.* **(8)** *Racial bias that results in discriminatory actions can be as dangerous to fellow staff members as the introduction of contraband.* **(9)** Whenever possible, provide notice and explanation for change

3

in policies and procedures that the inmates perceive as detracting from quality of their lives. **(10)** Be responsive to inmate requests for action or information. Respond in a timely manner and respond the first time an inmate makes a request. **(11)** Be dependable when dealing with inmates. If you say you are going to do something, do it. **(12)** It is important for staff to model the kind of behavior they expect to see duplicated by inmates. **(13)** The indiscriminate use of foul language by staff can only detract from the professional image staff must try to maintain. **(14)** There is inherent value in self-improvement programs. **(15)** *Inmates need legitimate opportunities to enhance their self-esteem.* **(16) Inmates are to be treated respectfully and with basic dignity.** Staff can treat inmates respectfully without compromising the essential element of professional distance. **(17)** Be courteous, polite and professional in all dealings with inmates, regardless of their behavior. **(18)** *Staff shall not condescend to or degrade inmates.* **(19) Some inmates are very intelligent and knowledgeable. Don't be threatened by, but rather capitalize on their skills. (20)** Never lie to an inmate. **(21)** Inmates will cooperate with staff to a much greater degree if motivated by respect rather than fear. **(22)** ***Do not impose rules, regulations, or regimentation that cannot be reasonably tied to the need to maintain order and security.*** **(23)** Stress the value of rewarding good adjustment with privileges and incentives. **(24)** Send clear messages regarding the kind of behavior that cannot be tolerated. **(25)** Inmate discipline must be consistent, fair and timely. **(26)** Use only the amount of force necessary, verbal or physical, to maintain order and security." *Id.*

**7.** As detailed herein, WMCI's staff unlawfully subjected the Plaintiff to the loss and destruction of his sacred religious property and the ability to worship the "*Great Creator who is Jesus Christ.*" This ongoing retaliation/harassment was for annoying the Defendants by asking them for his transcripts to be allowed into WMCI. They were to be sent from his mother who was living in hospice[3] so the Plaintiff could file his appeal with the transcripts asserting the exact locations and descriptions where the errors took place within. This hindered the plaintiff's ability to file his appeal effectively to the Tenth Circuit Court of Appeals[4] which was going on during the time this incident took place. In no reasonable way does the denial of Armajo's transcripts relate to legitimate penological interests, nor does it harm the safety or security of the facility.

---

[3] (See: **Exhibit R.I.P.**).
[4] See: *Armajo v. Wyo. Att'y Gen.*, No. 22-8049, 2023 WL 2028967, at *1-2 (10th Cir. Feb. 16, 2023) (*Armajo I*), cert. denied sub nom. *Armajo v. Hill*, 143 S. Ct. 2601 (2023).

**8.** The Defendants' ongoing harassment/retaliation was used as a way to dissuade the Plaintiff from further litigating his appeals.[5] This type of ongoing harassment/retaliation was used during a routine six month shake down.

**9.** The Defendants knew or reasonably should have known that the Plaintiff's sacred religious property was not 'contraband,' as it has survived other 'shake downs' during the previous six months. Additionally, the property was on his 'matrix list', and was clearly marked 'religious' and transparent.

**10.** The sacred religious property is used by the Plaintiff for treating known mental illnesses or sicknesses. The discrimination took place when Defendant Sanders stated that "the Plaintiffs beliefs were not part of his religious Christian beliefs,"[6] and that he "did not care that the Plaintiff used these sacred items for religious ceremonies." He took the religious property because it was not how the Defendants worshiped or practiced.

**11.** The Plaintiff told the Defendant that "his sacred property helps him bless and heal the sick and afflicted, and that the items have spirits themselves that helps the individuals heal or be cured of their demon possessions, based on Plaintiff's beliefs, and abilities to use the sacred spiritual items[7] to heal the sick and afflicted during 'Sweat Ceremonies' etc...;" the Defendant then told the Plaintiff to "grieve it." Denying the plaintiff his sacred religious property caused a list of systematic and emotional abuse, as well the loss of the ability to worship how the Plaintiff wants.

**12.** Willie LeClair[8] passed away in early 2023, during one of his Sweats at Wyoming State Penitentiary (WSP). As a result there were no Sweats for a long period of time in 2023. The loss of the Plaintiffs sacred property prevented his ability to worship. It took WMCI a whole year to find someone else to do the Sweats even though they had Staff/Officer's that could have run the

---

[5] "Essential to a retaliation claim is a showing that Plaintiff was engaged in a constitutionally protected activity." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007).

[6] **Proselytizing Prohibited:** Religious coordinators, **other WDOC staff**, volunteers from the community, religious mentors and offenders may not proselytize (i.e., attempt to persuade another individual, against that individual's wishes, to convert to one's belief) **or criticize the religious beliefs of others within the confines of any WDOC office or facility.** Nothing in this provision shall prohibit the sharing of information regarding religious beliefs in a manner authorized by policy. See: P&P #5.600 pg. 7 ¶ B.

[7] Cedar, Red paint/Ashes, Prayer Oils, and Spirit Beads.

[8] **Religious Representative:** (For this policy only.) A member of the clergy, *medicine person*, Imam, Rabbi, spiritual advisor, or other religious authority of sufficient rank to provide authoritative information to the Wyoming Department of Corrections regarding their religion. For purpose of Wyoming Department of Corrections' policy, a religious representative shall not be an inmate or offender on probation, parole or post-prison supervision, or otherwise disqualified from acting as a volunteer in a Wyoming Department of Corrections' correctional facility under WDOC Policy #1.601, Volunteers in Correctional Facilities.

Sweats for the Native Americans. They failed to try or ask Officer Beck to do so. (See **Exhibit 1** 10/11/2023, Inmate Communication Form WDOC Form 320).

**13.** Officer Beck, a Native American Piute Tribal Member, offered to run the Sweats. He ran many Sweats for the Native Americans for his own Tribe and should have been a prime candidate for the replacement of Willie LeClair. WMCI, in not allowing Officer Beck to run Native American Sweats, was a complete denial of the Native American Inmates religious rights. An entire year was too long of a period for worshiping to cease. The loss of sacred religious property and lack of a replacement spiritual leader caused violations of the First Amendment right to worship.

**14.** No other sect or religious group lost their ability to worship at WMCI for any amount of time. The Native American Group and followers were the only ones affected when WMCI stopped the sweats, making it impossible to effectively worship God.

**15.** WMCI might say they had an alternative way to worship, which is called [smudge], but it still requires a religious leader. There was another problem; there were no sage sticks in the Native box when Willie died. So, the Native American box was empty of herbs to use for smudging. Willie would bring the sage sticks, cedar, and herbs with him when needed to do the ceremonies. Additionally there was no officer that was able to take the Native Americans out to the yard to effectively worship like the Christian Group was able to worship.

**16.** The Satanic Group was allowed to hold their services without a spiritual advisor present.

**17.** The Defendant's denial of the Plaintiff's necessary sacred religious property and Native American therapeutic care was a denial of the Plaintiff's religious rights under the First and Fourteenth Amendments to due process and equal protection.

**18.** The Defendant(s) caused the Plaintiff to suffer significant harm(s). As a result, the Plaintiff was transferred from (WSP) because of a plethora of retaliation violations being done to him by certain staff. This was because he was doing his appeals and that annoyed certain staff at different facilities.[9]

**19.** The taking and destroying of said *sacred religious property* makes it *irreplaceable* now that Willie LeClair is deceased and the Plaintiff is unable to get or receive blessed Native Medicine at WMCI.

---

[9] See: case # 24-cv-00061-SWS that the actual physical harms done, as well this denial of the ability to worship.

**20.** The Plaintiff has not received any more Native Medicine and the *Proximate Injury* is due to the <u>loss and destruction of said Sacred Religious Property,</u> <u>and the ability to worship God in</u> <u>the way others are afforded that traumatized the Plaintiff from when he first entered the facility.</u>

## JURISDICTION AND VENUE

**21.** This action arises under the Constitution and the laws of the United States and is brought pursuant to the Fourteenth and First Amendments of the U.S. Constitution. This action is also brought pursuant to 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), 42 U.S.C. § 1997, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq.; and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2).

**22.** Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

**23.** This court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

**24.** Venue is proper in the District of Wyoming under U.S.C. § 1391 (b)(2) because a substantial part of the acts or omissions that gave rise to Plaintiffs' claims occurred in this District.

## PARTIES

**I.  Plaintiff**

**25.** Plaintiff Charles Alfred Armajo Jr. ("Armajo"), at all relevant times, Plaintiff was an Inmate of WMCI. He is from the Windriver Reservation and grew up in Ethete, Wyoming. He was born with the gift of healing people and was given the tool's necessary to do ceremonies that was passed down to him from his second great Grandfather Jake Whiteplume, who was in the Native American Church (NAC), and passed away in 1996. Plaintiff is also a NAC member of the Northern Arapahoe Chapter, as well as a prominent member and spiritual religious leader of the Northern Arapahoe Tribe, census #281–U012755. The Plaintiff had been ordained in the Church of Jesus Christ of Latter-day Saints (LDS). Plaintiff currently holds the keys to the Melchezidek priesthood, which is the order of the Holy priesthood in the LDS Church, since 2003.

## II. **Defendants**

**26.** Defendant Wyoming Medium Correctional Institution (WMCI) is a state correctional facility for adult inmates in Torrington, Wyoming. Defendant WMCI is a State entity within the meaning of 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), 42 U.S.C. § 1997, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq., and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2).

**27.** Defendant Wyoming Department of Corrections ("WDOC") is a State entity that governs the Wyoming Medium Correctional Institution pursuant to Wyo. Stat. §§ 9-2-2012 and 25-1-104(b)(iv). Defendant WDOC receives federal funding. Defendant WDOC approves and certifies placements, such as WMCI, as safe and appropriate placements for adult inmates. Defendant Wyoming Department of Corrections is charged with developing and overseeing an array of services, programs, and placements for both adult male and female inmates, including Wyoming's Women's Center (WWC), Wyoming State Penitentiary (WSP), and Wyoming's Honor Farm and Camps (WHF, and WHCC). Other adult services include court-ordered "probation and parole programs," whose primary purpose, along with all other state probation and parole placements for adults in Wyoming, is to "The department of corrections has general supervisory authority over state parolees and, subject to the order of the sentencing court, over probationers for whom the sentencing court requests supervision under W.S. 7-13-410(b)."[10] WDOC specifically oversees WMCI. In addition to its oversight responsibilities, Defendant WDOC also approves, monitors, and investigates allegations of abuse or misconduct at facilities and service providers for the adult inmate communities who are incarcerated in any of their facilities, including WMCI. In turn, whose WDOC-approved facilities receive funding for residential and treatment services for the adult inmate populations.

**28.** Defendant Daniel Shannon is the current Director of WMCI. At all relevant times, Defendant Shannon was the Director of WMCI. As the Director, Defendant Shannon was

---

[10] Wyoming Code, Title 25 Institutions of the State, Chapter 1 General Provisions, Article 1. Department of Corrections, § 25-1-104. Creation of department of corrections; duties; inspections of state institutions; regulations of prisoners produce goods.

responsible for the custody and control of the adults confined at WMCI. Defendant Shannon was a final decision maker with respect to Plaintiff's treatment while at WMCI.[11]

**29.** At all relevant times, Defendant Seth Norris was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as Warden at WMCI in Torrington, Wyoming. Today, Defendant Norris is still the current Warden at WMCI.

**30.** At all relevant times, Defendant Landen Sanders was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as a security guard at WMCI. Today, Defendant Landen Sanders in transition to the Wyoming State Police and is in the POST academy in Wyoming to become a patrol officer.

## FACTUAL ALLEGATIONS

**31.** The Wyoming Medium Correctional Institution is a state-run correctional facility for Adults with complex needs between eighteen and hundred years old. The facility consists of 15 pods on roughly about 100-acre plot of land in Torrington, Wyoming. The facility does not have any on-site residences for the Warden and/or Deputy Warden to ensure senior administrative staff is always present on-site.

**32.** WMCI is a Medium security level Institution, which means that the inmates held at this facility are non-Dangerous Offenders, and is used as the 'Fish Tank' for convicted felons who need to be processed to receive their inmate numbers before they are shipped to other WDOC facilities.

**33.** Wyoming law provides that "the institution or parent agency is established as an integral part of a correctional department or system by means of statutes that set its purpose. (ACA 4-4001) The purpose of this procedure is to establish the management philosophy, mission, vision, and core values that the Wyoming Medium Correctional Institution (WMCI) will employ in conducting its functions as established by W.S. § 25-1-104 and W.S. § 25-1-105.[12]

**34.** The Adult inmate male populations here at the WMCI have complex needs, and many of them suffer from many mental health disabilities and/or diseases, for which they require mental health treatment, and/or spiritual treatment. The only treatment that is available is called the

---

[11] Director: The person appointed by the Governor of the State of Wyoming to serve as the Chief Administrative Officer for the Wyoming Department of Corrections (WDOC) pursuant to W.S. § 9-2-1706 and in compliance with W.S. § 25-1-104.

[12] WMCI MANAGEMENT PHILOSOPHY MISSION, VISION, AND CORE VALUES, Supersedes Existing Procedure/Policy #1.002, July 17, 2023.

"bare bones treatment", which simply means slim to none treatment or inadequate treatment which they do not receive any treatment at all.

**35.** The Adult Inmate population at WMCI are diagnosed with, among other things, post-traumatic stress disorder ("PTSD"), ADHD, mood disorders, substance abuse, and other significant mental health impairments, as well as symptoms of bipolar disorder, psychotic disorder, depression and suffer from being possessed by demons. All of these symptoms can be treated and cured by Native American Spiritual Healing Ceremonies.

**36.** WMCI touts itself as a place where the staffs at "The Wyoming Department of Corrections will provide a seamless correctional system aimed at improving community safety through employee training, recognition and retention, evidence-based crime prevention, risk/need assessment, and recidivism reduction strategies. We focus on: Workforce excellence; Role modeling and reinforcing pro-social behavior; Redirecting behavior that is not pro-social in nature; Collaborative intervention to at-risk populations; Thorough and on-going individual gender specific risk/needs assessments; Utilize gender specific risk assessments to determine appropriate housing and community supervision/mentoring; Individualized quality services to victims, offenders and inmates; and, Successful collaborative re-integration back into society. The Staff of this Department assist offenders to realize their potential by employing the three (3) R's: Role Model, Re-Direct, and Reinforce."[13] What WDOC states that they are providing the inmate population here at WMCI is far from the truth.

**37.** WMCI falls woefully short of these espoused commitments, and the Adults Inmates who are housed there do not receive the medical, spiritual, rehabilitative, and a restorative treatment that WMCI promises. WMCI is also short staffed, over-worked, and are sometimes hostile towards their own staffs' e.g.,[14] Officer Mr. Beck, Officer Ms. Lloyd, and Officer Ms. Lake just to name a few who worked at WMCI. They actually wanted to do their jobs in trying helping the inmate population trying to achieve the things described above. They were forced to either find a new job or be terminated.[15] The majority of the staff here at WMCI condones each other's actions that have the mentality and fortitude of an "*US vs. THEM*" attitude and they are all in

---

[13] Wyoming Department of Corrections INMATE HANDBOOK REVISED: 2024 Pg. 5.
[14] Warden Ms. Ruby Ziegler at WHF Civil Action No. 22-CV-00257-SWS against the STATE OF WYOMING DEPARTMENT OF CORRECTIONS.
[15] See: Blueprint for Smart Justice Wyoming, ©2019 AMERICAN CIVIL LIBERTIES UNION. pg. 10 Budget Strains.

cahoots with each other so their actions will be affirmed and/or tolerated when writing up the plaintiff frivolously.[16]

**38.** Instead, the leadership and staff at WMCI regularly subject the Native American, Black, and Non-Native adult inmate population to cruel and harsh punishments, such as prolonged solitary confinement; improper use of restraints; discrimination of all kinds; Intimidation, verbal, emotional, and physical abuse; denial of necessary medical and necessary therapeutic care; and denial of a proper education, and necessary programing when needing to program before asking for a sentence reduction, as well as the main reason for this complaint; the ongoing retaliation/harassment in taking the *Plaintiffs' right to worship for a long period of time, among other things, such as sacred religious property that was taken and destroyed by WMCI Staff without permission.*[17]

**39.** On August 02, 2023, the denial of the Plaintiff's First Amendment right[18] was perpetrated by WMCI defendants that dramatically increased. The toxic and abusive culture that rippled down from WDOC's leadership Daniel Shannon to the Warden Seth Norris at WMCI, and other staff. Defendants Daniel Shannon, Seth Norris, and Landen Sanders, all participated in unconscionable denial of the right to worship and usage of sacred religious property towards the Plaintiff at WMCI.[19]

> Does WDOC's policy and "regulation violates the Religious Land Use & Institutionalized Persons Act ("RLUIPA"), which provides that the government may not impose a substantial burden on an inmate's exercise of religion unless the regulation in question furthers a compelling state interest in the least restrictive manner. 42 U.S.C. 2000cc-1(a); *Mayweathers v. Newland*, 314 F.3d 1062, 1070 (9th Cir. 2002) (upholding the RLUIPA's constitutionality). *Henderson* brought his claim under the First Amendment, not the RLUIPA, so here we apply only Turner's "reasonable relation" standard.

> "The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in a particular religious practice that he or she claims is being

---

[16] See: "The Stanford Prison Experiment" that was done by Stanford College in August 20, 1970.

[17] One of the first acts of Congress was passage of the Northwest Ordinance of 1789, which declared: "The utmost good faith shall always be observed towards Indians; their land and *property shall never be taken from them without their consent*." (*Emphasis added*) See: Act of Aug. 7, 1789, I Stat. 50.

[18] Prison walls do not form a barrier separating prison inmates from the protections of the constitution. *Turner v. Safley*, 482 US 78, 96 L Ed 2d 64, 107 S Ct 2254 (1987).

[19] "Thus, while inmates may lose many of their freedoms at the prison gate, they retain 'those rights [that are] not fundamentally inconsistent with imprisonment itself or incompatible with objectives of incarceration;" *Covino v. Patrissi*, 967 F2d 73, 77 2d (Cir 1992)(quoting *Hudson v. Palmer*, 468 US 517, 523, 82 L Ed 2d 393, 104 S Ct 3194 (1984).

affected; rather, we are to determine whether the inmates have been denied all means of religious expression." *Ward*, 1 F.3d at 877 (citing *O'Lone*, 482 U.S. at 351-52).

**40.** During that same 'shake down', there were other inmates using the same clear containers for their religious property, such as the "Three Flowers" containers that the plaintiff used when it was taken. The other inmate population also used these clear containers to hold their sage, cedar, herbs, oils, etc…, they also allowed them to have their medicine bags, and bibles/wands/feathers. These were not taken from them. The Plaintiff's was taken during the same 'shake down' by the defendants, violating his Fourteenth Amendment right to equal protection "class of one"[20] and to due process.[21]

> The Wyoming Supreme Court has recognized, that to "assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: **(1)** did the individual possess a protected interest such that the due process protections were applicable; and, if so, then **(2)** was the individual afforded an appropriate level of process." *Crofts v. State ex rel. Dep't of Game & Fish*, 2016 WY 4, ¶ 27, 367 P.3d 619, 626 (Wyo. 2016) (quoting *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004)).

**41.** What's worse, WDOC Director Shannon and Warden Norris of WMCI all signed off on the continuation of the denial of the First and Fourteenth Amendment right to worship under the United States Constitution, due to the loss and destruction of the sacred religious property. This would have been the Plaintiff's alternative way to worship when Willie died. This hindered the Plaintiff's ability to worship as there were no other herbs in the Native American box. And had there been any other herbs in the box, the plaintiff would have not have been able to take or use any of these herbs as they were not his to use or to keep. Either way this was the main reason

---

[20] In the case of Snyder he contends that the government singled him out for differential treatment for reasons unique to him rather that because of his membership in any group, his equal protection claim is of the "class of one" variety. See *id.* In such an equal protection claim, Snyder must show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. . . In a class of one equal protection claim, proof of a similarly situated, but differently treated, comparator is essential." *Snyder v. Gaudet*, 756 F.3d 30 (CA 1 2014).

[21] "*Violations of Due process*" The plaintiff's complaint raises arguable Fourteenth Amendment due process claims. To state a claim based on a denial of due process, a plaintiff must allege that he was deprived of a **protected liberty interest**, that is, a right protected by the Constitution or laws of the United States, without being afforded adequate procedures to reasonably ensure that the deprivation was not arbitrary, unreasonable, or based on error or mistake. See *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Such deprivations by state action do not amount to a constitutional violation actionable under § 1983 until and unless the state fails to provide due process. See *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990). In this context, due {1995 U.S. Dist. LEXIS 4} process means some form of pre- or post-deprivation review sufficient to protect the individual from arbitrary action. *Id.*, at 127-28. The federal due process clause does not by itself specify any particular procedure, and the amount of process which is due in a particular situation depends upon the extent of the deprivation and the nature of the liberty interest at stake. See *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484. (1972). *Newhouse v. Labelle*, Case No. 92-C-1316 (U.S. Dist. 1995).

why the sacred religious property was so precious to the Plaintiff to keep.[22] Everything that could have been used was gone as WDOC and WMCI does not provide these items for the Native American Group like how they provide for the Christians, Jews, and Muslims at the time Willie died. Again, WMCI might say there was an alternative way to worship, which is called [smudge], but it still requires a religious leader. Plaintiff asserts that these claims by WMCI are false-truths being told to the Court to undermine litigation.

First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. Second, whether there are "alternative means of exercising the right that remain open to prison inmates" must be assessed. Third, "the impact accommodation of the asserted constitutional right will have on the guards and other inmates, and on the allocation of prison resources generally" must be determined. Fourth, "the absence of ready alternatives" to the regulation must be explored. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Ward v. Walsh*, 1 F.3d 873, 876 (quoting *Turner*, 482 U.S. at 90) (internal citations omitted).

**42.** Defendant Seth Norris served as the former WSP Deputy Warden in 2020, and transitioned in 2022, to WMCI and *brought with him this culture of ongoing abuse, discrimination, and retaliation towards the Plaintiff from WSP*, where the Plaintiff had been recently housed and was retaliated against for working on his appeals by his staff at that institution of WDOC. Defendant Norris also did nothing to prevent the use of this ongoing retaliation/harassment method to deny the Plaintiff his First Amendment right to worship, despite having the authority to do so, before it was destroyed.

The Plaintiff's case differs from *Henderson's* case as they destroyed the plaintiff's *religious sacred items*. "In *Henderson's* case it composed of having to cut his long hair, 'If long hair were just one of many possible forms of religious expression, the denial of that {2004 U.S. App. LEXIS 10} single avenue of expression would not be as problematic. However, in this case, *Henderson* asserts that by cutting his hair, he would be considered "defiled" and therefore unworthy or unable to participate in the other major

---

[22] (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2), provides in part: "No govern-ment shall impose a substantial burden on the religious exercise of a person residing in or conto an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." Plaintiffs below, petitioners here, are current and former inmates of institutions operated by the Ohio Department of Rehabilitation and Correction and assert that they are adherents of "nonmainstream" religions: the Satanist, Wicca, and Asatru religions, and the Church of Jesus Christ Christian. They complain that Ohio prison of (respondents here), in violation of RLUIPA, have failed to accom-modate their religious exercise "in a variety of different ways, including retaliating and discriminating against them for exercis-ing their nontraditional faiths, denying them access to religious literature, denying them the same opportunities for group worship that are granted to adherents of mainstream reli-gions, forbidding them to adhere to the dress and appearance mandates of their religions, withholding religious ceremonial items that are substantially identical to those that the adherents of mainstream religions are permit-ted, and failing to provide a chaplain trained in their faith." *** *Cutter v. Wilkinson*, 544 U.S. 709; 125 S. Ct. 2113; 161 L. Ed. 2d 1020 (2005).

practices of his religion, *__like pipe ceremonies and sweat lodge__*, **and he would have to** *__destroy his religious items__*. **He would thus be** *__denied all means of religious__* *__expression.__*" *Id. Like how the Defendant's did to the Plaintiff's sacred religious items.*

When evaluating the second *Turner* factor, we have found relevant "the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul." *Ward*, 1 F.3d at 878; see also *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997) (noting that "requiring a believer to defile himself by doing something that is completely forbidden by his religion is different from (and more serious than) curtailing various ways of expressing beliefs for which alternatives are available"). In *Ward*, we considered an Orthodox Jewish inmate's challenge to a prison's failure to provide him with a Kosher diet. *Ward*, 1 F.3d at 877. Like asking an Orthodox Jew to eat {2004 U.S. App. LEXIS 11} non-Kosher food, cutting *Henderson's* hair involves a strict religious prohibition about the sanctity and purity of the body, and the concern we identified in *Ward* is heightened. Due to the particular nature of the religious belief at issue, this factor weighs in *Henderson's* favor. *Henderson v. Terhune*, 397 F.3d 709 (U.S.C. App. 9th Cir. (2004)).

Prison inmates "retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 96 L. Ed. 2d 282, 107 S. Ct. 2400 (1987) (citation omitted). Regulations that impinge on an inmate's constitutional rights will be upheld {2004 U.S. App. LEXIS 5} only if they are reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987).

**43.** There still is this culture in WDOC facilities, and at WMCI that allowed the Defendants to racially discriminate, and continuously retaliate against the Plaintiff, and destroy his religious property. This will continue to happen until something is done about it. There is a need for management reform at these locations and the actions of the defendants will be described below:

**I. <u>Religious Programming</u>:**

**44.** The General Principal WDOC acknowledges the inherent and constitutionally protected rights retained by incarcerated offenders to believe, express, and exercise the religion of their choice. The WDOC, therefore, shall extend to individuals under its custody and/or supervision those opportunities necessary to practice religious freedoms consistent with the prudent requirements of facility security, safety, health, and orderliness.

**45.** While at WMCI "It is the purpose of this policy to provide for religious programming for inmates including: (ACA 2-CO-5E-01) **(1)** Program coordination and supervision; **(2)** Opportunities to practice one's faith individually and corporately as authorized; **(3)** Possession of authorized religious symbols and/or items essential for faith practice purchased through authorized vendors at the inmate's expense; **(4)** Availability of religious program information to offenders; **(5)** Access to approved publications related to religious beliefs and practices; **(6)** The

observance of authorized religious diets, holy day ceremonies, work restrictions, and authorized communal sacramental rites (providing such rites do not conflict with existing procedures/policies or jeopardize the security and orderly running of the facility); **(7)** Distribution of resources among faith groups authorized to meet, commensurate with their representation within the population, to include the use of religious facilities and equipment; **(8)** Accessibility by staff religious coordinators to all areas of the facility; **(9)** Visitation of clergy/spiritual advisor to occur through established visiting procedures; **(10)** Use of community resources to include the use of religious volunteers, consistent with the safety and security of the facility." *Id*. See: Policy and Procedure # 5.600 pg.5.

**II. Defendant's Policies and Practices discriminated against the Plaintiff's right to worship and possess his religious property.**

**46.** The defendant(s) followed their policies to the "Letter" and it is a widespread custom within WDOC condoning deprivations of U.S. Constitutional Rights.[23]

"Allegations of a policy or custom which played a part in [Defendant(s)'] alleged violations of federal law are required for official capacity claims." See *Kentucky v. Graham*, 473 U.S. 159, 166 (1958); *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

**47.** Plaintiff has asserted facts that support the policies and customs which exist and that WDOC employee(s) and/or the Defendant(s) enforce in violation of Armajo's guaranteed constitutional rights.

This court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), cert. denied, 558 U.S. 1148 (2010).

**48.** In general, the Defendants used its Policy and Procedures to keep the Plaintiff from getting back his sacred religious items, claiming:[24] "Compelling Governmental Interests: Overriding concerns driven by the Wyoming Department of Corrections' Mission Statement that must be maintained, regardless of other issues or requests. These include, but are not limited to: safety, security, consistency, health and discipline. The Wyoming Department of Corrections

---

[23] Government officials performing discretionary functions are civilly liable only if their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

[24] Furthermore, while the Supreme Court has provided an exception to this rule, that a State or its officials may be held liable for § 1983 violations committed through enforcement of a policy or custom, Plaintiff's complaint contains factual allegations asserting a claim based upon enforcement of a policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("when execution of a government's policy or custom... inflicts the injury... the government as an entity is responsible under § 1983.").

shall use the least restrictive means in order to further a compelling governmental interest. Generally this means "within the inherent limitations of resources and the need for facility security, safety, health and good order, it is the policy of the WDOC to:

**49.** Offer inmates incarcerated in WDOC correctional facilities the opportunity to reasonably practice the religion of their choice;

**50.** Provide for the orderly management of inmate religious activities through supervision by facility religious coordinators and other WDOC employees, and with the assistance of approved religious volunteers;

**51.** Seek methods to encourage and foster understanding and appropriate due respect for the diversity of all religious beliefs, objects and practices by WDOC inmates, volunteers, and staff; and

**52.** Ensure WDOC policies, procedures and practices with regard to religious exercise and activities and religious programming are consistent with relevant provisions of the state and federal constitutions, statutes, and legal guidance;

**53.** Ensure inmates have the opportunity to participate in practices of their religion of choice deemed essential by the governing body of that religion, limited only by documentation showing threat to the safety of staff, inmates, or other persons involved in such activity, or the activity itself disrupts the security or good order of the facility; (ACA 5-ACI-7F-05) and

**54.** Provide for a separate process to amend religious activities or property. This policy will outline an initial review of such requests and provides for an appeal to the Director. The Director's decision is final and due to a separate appeal process provided by this policy, the grievance procedure outlined in Policy and Procedure #3.100, Inmate Communication and Grievance Procedure, does not apply for decisions which shall be made using WDOC Form #503, Establishing and Amending Faith Group Practices; and all of these things the Plaintiff had done. (See: **Exhibit 2** WDOC Form #503 Establishing & Amending Faith Group Practices).

   **i.** Concerns regarding misapplication of existing policy or practice regarding religious activities or property, within the jurisdiction of the correctional facility or the WDOC, do not require the submission of form #503, Establishing and Amending Faith Group Practices and are grievable issues.

      **a.** Inmates are expected to address and resolve such disputes to the facility religious coordinator whenever possible. The inmate shall use WDOC form #320, Inmate Communication Form when attempting to resolve such disputes.

**b.** The facility religious coordinator shall consult the Deputy Administrator of Contracts and Programming, to ensure consistency of interpretation and application of WDOC. Policy and procedures regarding existing inmate religious exercise and religious programming.

**c.** The inmate will receive a written response from the facility religious coordinator to the Form #320 request within thirty (30) days of receipt of the dispute by the facility religious coordinator. If the inmate is not satisfied with the response provided by the facility religious coordinator or does not receive a written response within the thirty (30) days allotted for response, the inmate may then use WDOC Policy and Procedure #3.100, Inmate Communication and Grievance Procedure to address his/her concern within the timeframes established by that policy.

**III. Religious Facilities and Equipment:**

**55.** It is the policy of the WDOC to require correctional facilities to provide space and equipment adequate for the conduct and administration of religious programs and to make available non-inmate clerical services for confidential material. (ACA 5-ACI-7F-07).

**56.** Religious Coordinators/Religious Volunteers. Each correctional facility shall have a qualified religious coordinator (or religious coordinators) with minimum qualifications including an accredited clinical pastoral education or equivalent specialized training and endorsement by the appropriate religious certifying body. Each religious coordinator shall assure equal status and protection for all religions. (ACA 5-ACI-7F-01).

**57.** A religious coordinator in each WDOC correctional facility shall be responsible for coordination, facilitation and supervision of inmate religious activities occurring at that facility. The facility religious coordinator and/or religious staff has physical access to all areas of the institution to minister to inmates and staff. (ACA 5-ACI-7F-02).

**58.** Religious coordinators shall attend to the religious/spiritual requests of each inmate, regardless of the inmate's religious belief or affiliation.[25]

**59.** Each facility religious coordinator,[26] in consultation with and approval from facility administration, shall plan, direct, and coordinate all aspects of the religious program at his/her

---

[25] Millions of people and hundreds of independent nations were prospering in what is now called the United States when Europeans first arrived in North America. One Scholar estimates that in 1492 there were as many as 5 million people and six hundred tribes inhabiting what is now the United States. See SHARON O'BRIEN, AMERICAN INDIAN TRIBAL GOVERNMENTS 14 (1989). See also Alvin M. Josephy, Jr., Introduction: The Center of the Universe, American in 1492: THE WORLD OF THE INDIAN PEOPLES BEFORE THE ARRIVAL OF COLUMBUS 3, 6 (Alvin M. Josephy., 1992); JOHN R. WUNDER, RETAINED BY THE PEOPLE: A HISTORY OF AMERICAN INDIANS AND THE BILL OF RIGHTS 10 (1994). They lived in communities spread all across the land. Each nation possessed its own government, culture, and language, and all of these people shared a deep religious faith centered in the sanctity of nature. O'BRIEN, supra note I, at 14-15.

respective facility, including approval and training of both lay and clergy volunteers from faiths represented by the inmate population. (ACA 5-ACI-7F-03).

    **i.** Facility religious coordinators shall keep an electronic file for all WDOC-recognized faith practices. These files shall include:

        **a.** Inventories of group property and inventories of materials approved for outdoor faith practices, with such inventories being conducted annually;

        **b.** All authorized package receipts for group property;

        **c.** All confiscation slips for group property and/or documentation for destroyed group property; and

        **d.** Records of those items that cannot be purchased through an approved vendor but are necessary for the faith practice and are approved to be donated to the group.

**60.** Facility religious coordinators shall coordinate access to appropriate facility space and equipment, religious publications (e.g., print, audio and audiovisual), religious objects/symbols, and the opportunity to adhere to dietary and other requirements of an offender's faith, as outlined in the Handbook of Religious Beliefs and Practices and WDOC Policy #5.601, Inmate Religious Diets.

    **i.** The Handbook of Religious Beliefs and Practices is intended to provide staff members with a central source for authoritative information on various religious beliefs and practices of particular religions/spiritual traditions of inmates in Wyoming Department of Corrections' correctional facilities.

**IV. Defendants were aware of, but ignored, the fact that the Plaintiff's freedom of religion and the right to worship, the confiscation of his sacred property, and destruction of his property were the proximate injuries done while in confinement.**

**61.** <u>Freedom of Religion</u>:

**62. Which provisions of the Constitution Guarantees Freedom of Religion?**

**63.** The U.S. Constitution contains two "religion" clauses, both of which are found in the First Amendment: the Establishment Clause and the Free Exercise Clause. They read as follows: "Congress shall make no law respecting an establishment of religion or prohibiting the free

---

[26] Coordination of the Religious Program: Under this policy, a qualified senior staff member is responsible for coordinating the agency's religious program, and that staff member: (ACA 2-CO-5E-02) **1.** Specifies the lines of authority, responsibility, and accountability for the religious program; **2.** Enables inmates to identify religious preferences upon entering the system and provides a process where preferences may be changes; **3.** Ensures that inmates are not subjected to coercion, harassment, or ridicule due to religious affiliation; **4.** Describes the conditions and circumstances under which clergy's privilege communication exists, including circumstances under which privileged communication in the correctional setting does not apply and should be clearly stated; and **5.** Ensures that staff who have direct contact with inmates are given training regarding religious practices.

exercise thereof." These Clauses, originally directed only at Congress, were made applicable to state and local governments with the passage in 1868 of the Fourteenth Amendment.[27]

**64. What Rights are conferred by the Establishment and Free Exercise Clauses?**

65. Many of the Europeans who first settled in what is now the United States were driven from their homelands because of their religious beliefs and came here to find freedom of religion. The Establishment and Free Exercise Clauses were included in the Constitution in order to help make their dream a reality and to ensure that a religious strife present in certain European countries would not occur here.[28]

66. The Establishment Clause guarantees the separation of church and state. This ensures that the government does not control religion, and religion does not control the government. The government must remain neutral in religious matters, neither promoting religion nor inhibiting the private exercise of it. Government agencies may not sponsor religious activities or engage in them. This protects *the government* from becoming a tool for religious advocacy because religious adherents cannot use the government to promote their faith, while at the same time it safeguards *religion* form becoming a target of government interference and control.[29]

67. The Free Exercise Clause guarantees freedom of worship. People in this country remain free to believe in any religion of their choosing, or no religion at all, and to follow their own conscience in matters of religion.[30] Taken together, the Free Exercise and Establishment Clauses ensure that religion will be left to individual and family choice and that the government will not seek to meddle in religious affairs, or show a preference for one religion over another or a preference for religion over non-religion.

**68. How do these Clauses Protect Indians?**

69. Religion has special significance to Indians. In the traditional Indian perspective religion and life are one and the same. Everything in nature is part of the spiritual world and one's goal is to live in harmony with nature. In few other societies is the role of religion as significant as it is in Indian societies.[31]

---

[27] *Everson v. Board of Education*, 330 U.S. I (1974); *McCollum v. Board of Education*, 333 U.S. 203 (1984).

[28] See *Engel v. Vitale*, 370 U.S. 421, 425-30 (1962); *Abington School District v. Schempp*, 374 U.S. 203, 212-15 (1963).

[29] See *Engle*, 370 U.S. 421 and *Abington*, 374 U.S. 203. See also *Epperson v. Arkansas*, 393 U.S. 97 (1968).

[30] *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Thomas v. Review Board*, 450 U.S. 707 (1981).

[31] See John Rhodes, *An American Tradition: The Religious Persecution of Native Americans*, 52 MONT. L. REV. 13 (1991); Russel L. Brash, *The Illusion of Religious Freedom for Indigenous Americans*, 65 OR. L. REV. 363 (1986).

**70.** "Indian religion and culture are functionally inseparable, so that one cannot meaningfully discuss Indian religion apart from Indian life in general."[32] Therefore, the Free Exercise Clause–with its guarantee of religious freedom–is especially important to Indians because of the central role that religion plays in Indian Life.

**71.** Until twenty-five years ago courts had interpreted the Free Exercise Clause as barring the government from engaging in any activity that infringed on religion unless the government could prove that the activity served a compelling governmental interest and that no less injurious alternative was available–the *Compelling Interest Test.*[33] In other words, the government had to prove that this particular encroachment on religious freedom was necessary to accomplish a compelling interest and that nothing short of this measure would suffice.[34]

**72.** However, in more recent years, the Supreme Court has changed course and narrowed the scope of the Free Exercise Clause. In a series of four cases (three of which involved Indians; the fourth involved Muslims) the Court held that uniformly applied, religiously "neutral" laws need only pass the *rational basis test*—not the Compelling interest test—to be valid under the Free Exercise Clause. Under the rational basis test a government activity that interferes with religion does not violate the Free Exercise Clause if it has a rational basis. That is, any legitimate purpose. Obviously, then, the rational basis test is the less stringent test as it is much easier for the government to show that an activity has some–any–legitimate purpose than to show that a compelling interest requires this particular measure.

**73.** The first of these four cases, *Bowen v. Roy* (1968),[35] involved a federal statute that requires persons applying for certain welfare benefits, including food stamps, to provide a social security number to qualify. The father of an Indian child sought an exemption from this requirement, claiming that assigning his child a number would violate the father's religious beliefs and thus violate his rights under the Free Exercise Clause. The Supreme Court found that the statute was neutral because it required all applicants for these programs to provide a social security number; in other words, all applicants were treated the same way. Moreover, the law had

---

[32] Bryan J. Rose, *A Judicial Dilemma: Indian Religion, Indian Land, and the Religion Clauses*, 7 VA. J. SOC. POL'Y & LAW 103, 105 (1899) See also Michelle Kay Albert, *Obligations and Opportunities to Protect Native American Sacred Sites Located on Public Lands*, 40 COLUM. HUM. RIGHTS L. REV. 479, 487 (2009).

[33] See *Employment Division v. Smith*, 494 U.S. 494 U.S. 872, 891-97 (1990) (O'Conner, Brennan, Marshall, JJ., concurring).

[34] For a discussion of the compelling interest test, see *Citizens United v. Federal Election Commission*, 130 S.Ct. 876, 898 (2010); *Johnson v. California*, 543 U.S. 499, 505-10 (2005); *Edenfield v. Fane*, 507 U.S. 761 (1993).

[35] 476 U.S. 693 (1986).

a legitimate purpose because requiring applicants to provide their unique social security number helps with identification and protects against fraud. Therefore, the Court held, the government was entitled to enforce this general rule on all persons despite its harmful effect on certain faiths.

74. In the second case, *O'Lone v. Estate of Shabazz* (1987),[36] Muslim prisoners challenged a prison regulation that compelled them to work during a time in the afternoon when their faith required them to pray. The Supreme Court found that the prison's regulation was religion-neutral because all prisoners were required to work during that period of time; that is, it applied equally to everyone. The Court also found that requiring prisoners to work during those hours—and not requiring prison officials to make exceptions—served a legitimate purpose. Therefore, the Court concluded, the regulation did not violate the Free Exercise Clause even if it prevented some prisoners from engaging in a religious practice they considered mandatory.

75. In *Lyng v. Northwest Indian Cemetery Protective Ass'n* (1988),[37] several Indian tribes sought to prevent the U.S. Forest Service from following through with plans to build a road in a national forest that would go through a sacred Indian site. Agency officials acknowledged that the road "could have devastating effects on traditional Indian religious practices."[38] However, building the road around the sacred area would cost more money, and the Forest Services decided to desecrate the site rather than spend the extra money. The Supreme Court acknowledged that completion of the road would "virtually destroy . . . the Indian's ability to practice their religion,"[39] Nevertheless, the Court upheld the agency's decision, finding that it was rational for the government to choose the least expensive option.

76. In *Employment Division v. Smith* (1990),[40] the Supreme Court reviewed an Oregon law that prohibited all persons from ingesting peyote. The case was filed by two Indians who had been fired from their jobs for having ingested peyote in a religious ceremony during their off-duty hours and then were denied unemployment compensation benefits. The two religious

---

[36] 482 U.S. 342 (1987).

[37] 485 U.S. 439 (1988).

[38] *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 451 (1988). See also *Fools Crow v. Gullet*, 706 F.2d 856 (8th Cir.), cert. denied, 464 U.S. 997 (1983); *Badoni v. Higginson*, 638 F.2d 172 (10th Cir. 1980), cert. denied, 452 U.S. 954 (1981); *Sequoyah v. TVA*, 620 F.2d 1159 (6th Cir.), cert. denied, 499 U.S. 953 (1980).

[39] *Lyng*, 485 U.S. at 451 (citation omitted). For a critical analysis of the Court's decision in *Lyng, see* Alex Tallchief Skibine, *Culture Talk or Cultural War in Federal Indian Law*, 45 TULSA L. REV. 89, 100-04 (2009-10). Walter Echo-Hawk calls the *Lyng* decision one of the ten worst cases ever decided by the Supreme Court. See Walter ECHO-HAWK, IN THE COURTS OF THE CONQUEROR: THE TEN WORST INDIAN LAW CASES EVER DECIDED 325-56 (2010).

[40] 494 U.S. 872 (1990).

adherents challenged the denial of their unemployment compensation benefits. Their employer claimed that they were fired for good cause—having used an illegal drug—and that therefore he did not have to pay them any benefits. The Indians argued that the Free Exercise Clause protected their right to use peyote as a sacrament during their off-duty hours. The Court began its analysis of this controversy by reaffirming the principle that "generally applicable, religion-neutral laws" need only be reasonable to be valid even if they "have the effect of burdening a particular religious practice."[41] The Court found that the purpose of the ban on peyote was not to burden religion but to stop the use of a hallucinogenic drug, a legitimate government interest. Therefore, the Court held, this religion-neutral law could be applied in this context, and the Court upheld the denial of unemployment benefits.

77. While the switch from the compelling interest test to the rational basis test places all religions at risk, in reality, minority religions are at risk the most. This is because, due to public pressure, government officials are unlikely to take an action harmful to majority religions. For instance, officials in New York City would never tear down St. Patrick's Cathedral in order to build a road, even if that were the cheapest route. Yet government officials in *Lyng* wanted to build a road through a site no less sacred to Indian tribes than St. Patrick's Cathedral is to Catholics. In *O'Lone*, prison officials enacted a "neutral" rule requiring that all prisoners work weekday afternoons. It would be equally as "neutral" to require that all prisoners work Sunday mornings, but no such rule will ever be enacted because that is the time when Christians go to church.

78. The new standard in Free Exercise cases has resulted in religious adherents losing lawsuits they once would win. To illustrate, in the years prior to these four Supreme Court cases, Indian prisoners who wore long hair for religious reasons won several cases challenging prison rules that banned prisoners from wearing long hair; the prison officials in those cases were unable to show a compelling need to enforce their policy as to these religious adherents.[42] However, since federal courts have begun using the rational basis test, Indians have lost most of these same types of challenges.[43]

---

[41] *Employment Division v. Smith*, 494 U.S. 872, 886 n.3 (1990) (O'Connor, Brennan, Marshall, JJ., concurring).

[42] See, e.g., *Teterud v. Burns*, 522 F.2d 357 (8th Cir. 1975).

[43] See *Henderson v. Terhune*, 379 F.3d 709 (9th Cir. 2004); *Harris v. Chapman*, 97 F.3d 499, 503-04 (11th Cir. 1996); *Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996); *Pollack v. Marshall*, 845 F.2d 656 (6th Cir.), cert. denied, 488 U.S. 897 (1988). Other Free Exercise challenges by Indians following the Supreme Court's recent line of cases have also for the most part fared badly. See *Gonzalez v. Litscher*, 79 Fed. Appx. 215 (7th Cir. 2003)

**79.** Some Free Exercise cases have been successful even under the rational basis test. In one case, a federal court (in a decision authored by Judge, now Supreme Court Justice, Samuel Alito) held that a state statute violated the Free Exercise Clause because it granted greater rights to zoos to keep bears than it did to an Indian who wanted to possess a bear for religious reasons. The Court found no rational reason to allow zoos, but not religious adherents, to keep bears.[44]

**80.** The federal government has long been antagonistic to Indian religion, and many people view the Supreme Court's decision in *Bowen*, *Lyng*, and *Smith* as a continuation of that policy.[45] For nearly 150 years after the United States became a nation, federal officials not only encouraged but even financed missionaries whose goal was to convert reservation Indians to Christianity, and during the late 1800s, federal officials prohibited some tribes from preforming particular sacred ceremonies.[46] Indian religion, which is not based on sacred text, such as a bible, is fundamentally different from Christianity, and it has generated suspicion and intolerance. There continues to be great insensitivity for, and misunderstanding of, Indian religion. This continues to be great insensitivity for, and misunderstanding of, Indian religion. This prevailing attitude by non-Indians makes it difficult for Indians to protect their religious practices (and, as explained below, their sacred places) from government interference.[47]

**81. How do the American Indian Religious Freedom Act of 1978, the Religious Freedom Restoration Act of 1992, and the Religious Land Use and Institutionalized Persons Act of 2000 Protect Indians?**

**82.** After conducting and extensive investigation, the U.S. House of Representatives issued a report in 1978 concluding that Indian religious practices were often unnecessarily disrupted by state and federal laws and activities.[48] The report found that on numerous occasions Indians had been prevented from conducting religious ceremonies at sacred places, denied the use of

---

(upholding prison ban on Indian medicine bags and a ceremonial drum); *Allen v. Toombs*, 872 F.2d 563 (9th Cir. 1987) (prison refusal to allow a sweat lodge); *Standing Deer v. Carlson*, 831 F.2d 1525 (9th Cir. 1987) (prison ban on headgear). However, courts have required prison officials, even under the rational basis test, to show proof that the activity in question is a threat to prison security and not merely on speculation. See *Swift v. Lewis*, 901 F.2d 730 (9th Cir. 1990) (long hair); *Sapa Najin v. Gunter*, 857 F.2d 463 (8th Cir. 1988) (access to spiritual leaders); *Whitney v. Brown*, 882 F.2d 1068 (6th Cir. 1989) (attending religious services).

[44] *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3rd Cir. 2004). See also *Youngbear v. Thalacker*, 174 F. Supp.2d 902 (C.D. Iowa 2001) (holding that Indian prisoner in a medium custody prison has a Free Exercise right to use a sweat lodge for religious purposes).

[45] See ECHO-HAWK, *supra* note 15, at 325-56; FRANK POMMERSHIEM, BROKEN LANDSCAPE: INDIANS, INDIAN TRIBES, AND THE CONSTITUTION 183-97 (2009).

[46] See POMMERSHEIM, *supra* note 22, at 185-86.

[47] *Id.* at 208.

[48] H.R. Rep. No. 1308, 95th Cong., 2d Sess., reprinted in 1978 U.S. Code Cong. & Admin. News 1262.

religious sacraments, and prevented from preforming worship services in their traditional manner due to unnecessary government interference. The report recommended that Congress enact remedial legislation.

**83.** Congress responded by passing a joint resolution called the American Indian Religious Freedom Act (AIRFA) in 1978.[49] As with all joint resolutions, AIRFA does not have the same status as a federal law, and it contains no penalty provision that can be imposed against violators. Still AIRFA declares a policy that Congress has pledged itself to pursue:

**84. § 1996.  Protection and preservation of traditional religions of Native Americans:**

[H]enceforth it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites. *Id.*

**85.** The objective of statutory interpretation is to ascertain and effectuate the intent of the legislature. The Courts responsibility lies in examining the constitutional question of whether the Defendants denied the Plaintiff his right to Practice his Tradition's a right in violation of the First, Fourteenth Amendment of the United States Constitution, and also 42 U.S.C. § 1996 which provides;

**86.** The American Indian Religious Freedom Act of 1978 is a joint resolution of Congress that establishes the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise their traditional religions, including but not limited to access to sites, *use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites*.[50] *Id.* Although, there is a statutory right guaranteed in Wyoming[51] that survives the muster of the Defendants defenses that might be raised in defense of these allegations. That would make sure that the Government is held accountable for the violations of these rights being violated.

---

[49] S.J. Res. 102, Aug. 11, 1978, Pub. L. No. 95-341, 92 Stat. 469, codified in part 42 U.S.C. § 1996
[50] Because American Indian Religious Freedom Act of 1978 does not provide means of legal recourse for any tribe or individual, district court did not err by concluding that inmate could not raise claim under Act; Act was simply policy statement and did not create cause of action or any judicially enforceable individual rights. *Henderson v. Terhune*, 379 F.3d 709, 2004 U.S. App. LEXIS 16613 (9th Cir. 2004).
[51] Wyoming Constitution Article 1, §§§ 6, 18, & 20; and Wyoming Statute § 6-2-301(a)(vi) supra. Establishment Clause test under *Lemon v. Kurtzman* is inapposite in strict liability. *Cf. Capitol Square Review & Advisory Bd. V. Pinette*, 515 U.S. 753, 768 n. 3 (1995) (stating the test "supplies no standard whatsoever") and *United States v. Santos*, 553 U.S. 507, 514 (2008). If *Lemon* is applied, the statute has no secular purpose; primarily has the effect of advancing or inhibiting religion; and fosters excessive entanglements with religion. *State v. Wenthe*, 839 N.W.2d 83, 87 (Minn. 2013); *State v. Hershberger*, 462 N.W.2d 393, 398 (Minn. 1990).

24

87. The Court will see that the Plaintiff's First and Fourteenth Amendment constitutional right to practice his traditional ceremonial rights was violated by the Defendants. 42 U.S.C. § 1996 is a useless statue on the books because it is a statute with no "teeth" and has no "bite". This law Congress created is useless when compared to other laws that were created for other religious sects protections. There's a need for this case to provide the ***proper vehicle*** for the Court and/or Congress to revisit this same statue, and provide for its provisions criminal defenses, constitutional protections that public officials would be required to enforce, and penalties that should have been created for such violations of fundamental rights, being violated by the violators, this enactment needs to be amended so that the violators will have to face consequences to keep them from violating such rights. Without any recourse it allows the government employees to keep violating constitutional rights, knowing that they could hide behind the shield of the Government. *Justice demands* amending this Statute, as this Statute belongs to the Native Americans, and to the Plaintiff.

88. However, AIRFA has not been very effective. In *Lyng*, the Supreme Court stated that because AIRFA was not a law and contained no penalty for violators, it has "no teeth," and the Court essentially ignored it.[52] Other courts have said that AIRFA only requires public officials to "consider" Indian interests and not necessarily to act in accordance with them.[53]

89. Rather than amend AIRFA, Congress passed the **Religious Freedom Restoration Act (RFRA)** in 1993, a law supported by numerous religious groups concerned about the Supreme Court's recent Free Exercise decisions.[54] Designed to overrule the *Bowen-O'Lone-Lyng-Smith* line of cases, RFRA requires federal courts to use the compelling interest test (rather than the rational basis test) in deciding all cases in which a citizen demonstrated that a government action, whether federal, state, or local, was substantially burdening a religious practice or exercise.[55]

90. Four years after RFRA was passed, the Supreme Court held in *City of Boerne v. Flores* (1997)[56] that the Tenth Amendment to the Constitution, which limits Congress from regulating the states in certain circumstances, prevented Congress from forcing state and local governments to comply with RFRA. On the other hand, in *Gonzales v. O Centro Espirita Beneficente Uniao*

---

[52] *Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439, 455 (1988).
[53] See *Wilson v. Block*, 708 F.2d 735, 746 (D.C. Cir.), cert. denied, 464 U.S. 956 (1983); *Standing Deer v. Carlson*, 831 F.2d 1525, 1530 (9th Cir. 1987).
[54] **42 U.S.C. § 2000bb** *et.seq*
[55] 42 U.S.C. § 2000bb(b)(I)
[56] 521 U.S. 507 (1997).

*do Vegetal* (2006),[57] the Court held that Congress did have the authority to require federal officials to comply with RFRA. As a result of *City of Boerne* and *Gonzales*, federal courts deciding religious challenges to state and local activity must use the rational basis test under the Free Exercise Clause, whereas in deciding religious challenges to federal activity they will use the compelling interest test under RFRA.

**91.** Following *City of Boerne*, which thwarted Congress' attempt to restore the compelling interest test to state and local action, Congress held a series of hearings and ultimately enacted in 2000 the **Religious Land Use and Institutionalized Persons Act** (RLUIPA).[58] To avoid a Tenth Amendment challenge, Congress narrowed the scope of RLUIPA so that it applies only to situations in which the state activity being challenged receives federal funds and involves either **(1)** land use (zoning) regulations, or **(2)** *religious exercise being performed by institutionalized persons, such as prisoners, in facilities receiving federal funds.* RLUIPA requires federal courts to apply the compelling interest test to assess the constitutionality of all actions that impinge on religion in those two contexts. In 2005, the Supreme Court in *Cutter v. Wilkinson*[59] upheld the validity of RLUIPA, stating that Congress has the authority to impose this restriction on state and local governments due to the fact that federal funds were involved in the actions being challenged.

**92.** Courts have applied RFRA and RLUIPA broadly, consistent with the clear intent of Congress to confer added protections to religious activity.[60] Still, even under the compelling interest test, the government prevails in many cases.[61] This is especially true in the prison setting. Maintaining security in a prison is a compelling government interest and prison officials have shown to the satisfaction of many courts that certain religious activities, such as the use of a sweat lodge in a maximum security prison[62] or the wearing of long hair by prisoners,[63]

---

[57] 546 U.S. 418 (2006).
[58] **114 Stat. 804, 42 U.S.C. § 2000cc.**
[59] 544 U.S. 709 (2005).
[60] See e.g., *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005); *Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001).
[61] See *United States v, Friday*, 525 F.3d 938 (10th Cir. 2005), cert. denied, 129 S. Ct. 1312 (2009); *Hoevenaar v. Lazaroff*, 422 F.3d 366 (6th Cir. 2005); *United States v. Tawahongva*, 456 F.Supp.2d 1120 (D. Ariz. 2006).
[62] See *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996) (RFRA claim); *Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008), cert. denied, 129 S.Ct. 1585 (2009) (RLUIPA claim). But see *Pounders v. Kempker*, 79 Fed. Appx. 941 (8th Cir. 2003)(holding that a prisoner in a medium  or minimum security prison may have a right to use a sweat lodge, even though maximum security prisons need not provide access to one); *Youngbear v. Thalacker*, 174 F. Supp. 2d 902 (C.D. Iowa 2001) (holding that an Indian prisoner in a medium custody prison has a Free Exercise right to use a

jeopardizes prison security. Indian religious practitioners, though, have won victories under RFRA or RLUIPA that they probably would have lost had those statutes not been passed, including cases involving sweat lodges, long hair, and medicine pouches.[64] Moreover, as a result of these laws, government officials, including many prison administrators, have tried harder and in good faith to accommodate the religious needs of Indian practitioners.[65]

**93.** As RFRA and RLUPIA illustrate, Congress is permitted to pass a law that creates a right that does not exist under the Constitution (and Congress has passed scores of civil rights laws that do precisely that). Many Indians and other persons concerned about religious practices have actively lobbied Congress—as well as state legislatures—to pass protective legislation. Some of these efforts have been successful. For example, several states[66] and the federal government[67] have passed laws protecting the sacramental use of peyote. The federal law prohibits the states from making it a crime for an Indian to use, possess, or transport peyote "for *bona fide* traditional ceremonial purposes in connection with the practice of a traditional Indian religion."[68] The Bald and Golden Eagle Protection Act[69] authorizes the Secretary of the Interior to permit Indians to possess eagles and eagle parts (such as feathers and talons) for use in religious ceremonies.

**94.** Some state constitutions and state laws provide protections for religious exercises beyond those provided by the federal constitution.[70] For instance, a law passed by New Mexico, the

---

sweat lodge for religious purposes); *Farrow v. Stanley*, 2005 WL 2671541 (D.N.H. 2005) (*recognizing that prisoners denied access to a sweat lodge by prison officials has a claim for relief under RLUIPA*).

[63] *Diaz v. Collins*, 114 F.3d 69, 73 (5th Cir. 1997).

[64] See *Warsoldier*, 418 F.3d 989 (right to wear long hair in prison); *Smith v. Beauclair*, 2006 WL 2348073 (D. Idaho 2006) (*right to have a Sacred Fire, wear a beard, and use medicinal herbs*); *Farrow*, 2005 WL 2671541; *Odneal v. Pierce*, 324 Fed. Appx. 297 (5th Cir. 2009) (unpublished), on remand, 2012 WL 3359535 (S.D. Tex. 2010) (holding that allegation that prisoner was prohibited from wearing his hair in a kouplock states a claim for relief under RLUIPA); *Hyde v. Fisher*, 203 P.3d 712, 730 (Idaho App. 2009) (holding that even a maximum security prison must provide some access to a smudging ceremony for Indian religious adherents).

[65] For instance, many prisoners have chosen to construct a sweat lodge and allow Indian practitioners to use it on a regular basis. See *Farrow*, 2005 WL 2671541 (listing prisons that have constructed a sweat lodge). See also *Yellowbear v. Lampert*, Civ. No. 08-cv-013J (order filed July 29, 2008) (ordering prison officials to permit an Indian practitioner to possess up to four eagle feathers in his cell for religious purposes).

[66] See ARIZ. REV. STAT. ANN. § 13-3402(b)(1)-(3) (1989); COLO. REV. STAT. § 12-22-317(3) (1985); N.M. STAT.ANN. §30-31-6(D) (Supp. 1989).

[67] 42 U.S.C. §1996a; see 21 C.F.R. § 1307.31 (1990). See *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991).

[68] 42 U.S.C. § 1996a(b)(1).

[69] 16 U.S.C. § 668(a).

[70] See *Humphery v. Lane*, 728 N.E.2d 1039 (Ohio 2000) (holding that the Ohio constitution prohibits prison officials from requiring Indian prison officer to cut his hair in violation of his religious beliefs); Article 1, section 3 and 4, and Article 4, section. 2 of the Idaho Constitution (granting more extensive free exercise rights than under the

Native American Counseling Act, provides that all state prisoners may keep personal medicine pouches, must be allowed access to a sweat lodge, and may possess certain materials used in their religious ceremonies.[71] In 2010, a Court concluded that a law passed by Texas similar to the federal RFRA protected the right of an Indian student in public school to wear his hair in traditional braids as a form of religious expression despite the school's ban on boys having long hair.[72]

**95. Plaintiffs status on his beliefs:**

**96.** Plaintiff identifies as a Native American member of the "Northern Arapahoe Tribe, #281-U012755.[73] A "Traditional Medicine Man/HOLY MAN" and servant of God. "And maintains his" "sincerely held Native American Traditional way's." For him, this belief system occupies the place that one associates with other religions: it comforts, guides, and provides meaning to [plaintiff] in the way that religions traditionally provide such comfort, guidance, and meaning to others. "Religious Ceremonies played an important part in the life of most Indian tribes. Many of these ceremonies were aimed at assuring a plentiful supply of food, and some lasted several days." "When boys- and, in some tribes, *girls- reached their early teens, they went through an initiation ceremony to help them find a guardian spirit.* Many boys went without food until they saw a vision of their guardian spirit."[74]

**97.** "Human beings must always be "clean" whenever they hunt, fish, or gather herbs. This means a clean body, no sex, no alcohol, nor women on their menses. *Reason: Natural food and plants have power.* Human beings should always "pray" to the entity before taking its life and explain why it is being used. Humans must be clean mentally, physically, and spiritually whenever praying and using this power. In this way the spiritual powers of the entity will be transferred to the human along with the physical properties. Nature's powers strengthen our soul and enrich our health. Negative powers contaminate our soul and weaken our health. Abuse of "powers" causes sickness to the violator."[75]

**98.** "**Shamans:** The spirit world could also be reached with the help of a religious helper called a shaman. The shaman was believed to have close contact with the spirit world. Shamans

---

federal constitution), and Idaho Code §§ 73-401 *et seq.*, the Free Exercise of Religion Protected Act, which is similar to RLUIPA in scope. See *Hyde v. Fisher*, 203 P.3d. 712, 730 (Idaho App. 2009).
[71] NMSA § 33-10-1 *et seq.*
[72] *A.A. v. Needville Independent School District*, 611 F.3d 248 (5th Cir. 2010).
[73] Northern Arapahoe Tribal Identification number with the Bureau of Indian Affairs.
[74] The World Book Encyclopedia I Volume 10 Field Enterprise Educational Corporation 1976 U.S.A. pg.'s 122-123.
[75] NATIVE HEALER INITIATION INTO AN ANCIENT ART. By, Medicine Grizzlybear Lake pg. 197, 198, 199.

were sometimes called *Medicine Men because their task included curing the sick. Most Indians believed that disease was caused by some object in the body. The shaman began his cure with various songs and movement.* Using Rattles that have spirit beads in them, and drums.

**COW HORN RATTLES**                    8505.++

These rattles are made in Canada and are a part of the progression in musical traditions in the Northeast. Originally rattles were made of gourds, turtle shells, or buffalo horn. Today these horns come from domestic cows. Each are slightly different in horn color or shape and size, but all have a good sound for singing both social and ceremonial dance songs. The small sizes we formally carried are no longer available. The large sizes are about 10 inches in length.



**10**

**10 Large Cow Horn Rattle        $33.00/each**



**LARGE WOOD BEAD**                    1050.***



Commonly used in making Mandalas at the end of wool drops. (See page 40) You also can use as decoration in other large weaving projects. The center hole is about ½ inch across and outside diameter about 1½ inch.

**021 Blond Natural    $.95/each    $8.50/per 10**
**159 Walnut           $.95/each    $8.50/per 10**

**Noc Bay Trading Company.**

**99.** "He usually blew tobacco smoke over the sick person because tobacco was believed to have magical powers. The shaman sucked on the body of the sick person until he "found" the object causing the illness. Then he spit out the object-usually a small stick, bone, or a stone. Shamans had some knowledge of medicine. They could set broken bones and used various herb remedies. Many of the plants they used are still used by doctors today. Occasionally, shamans joined together to form a religious organizations called a curing society. Such organizations included the Midewiwin Society of the Algonkians and the False Face Society of the Iroquois."[76] See: Exhibits of the herbs and other items used for ceremonies below.

---

[76] The World Book Encyclopedia I Volume 10 Field Enterprise Educational Corporation 1976 U.S.A. pg.'s 122-123.

## HERBALS

All from the best available sources here in the United States. **Supplies may be limited at times or only seasonally available.** We make no other warranty of these natural materials.



> Herbals are currently difficult to collect and move through the supply chain. Throughout this year check our web site store for those currently available.

### WHITE SAGE                                   8702
This White Sage comes from southern California. A very aromatic sage. Packaged loose leaf in bags of 2 ounces. Also available by the pound.

$6.75/2 ounce package                    $36.00/pound



### WHITE CEDAR DRIED LEAF                       8703
Collected here in the Upper Peninsula of Michigan in our Noc Bay area, this is a very aromatic flat leaf cedar commonly found in our forested wetlands. Used by many Native people in ceremonies. Provided as trimmed dry leaves as shown.

$3.50/1 oz. package               $45.00/pound



### NORTHERN PLAINS SAGE BUNDLE                  8714
This sage is collected in the North and South Dakota area and has a nice broad leaf. Wrapped into bundles approximately 10 inches in length, this sage has a distinctive mild aroma.

$11.95



### BITTERROOT                                   8706
In some places it is referred to as Flagroot. It is hand harvested, trimmed and dried for ceremonial use. These roots, or other sub-species, were traditionally used as medicine throughout North America. Common reference is for use to relieve the effects of a sore throat, especially by singers at the drum.

$9.95/¾ ounce package

### GREY SAGE BUNDLE                             8712
A very tightly wrapped bundle of western desert Grey Sage. Average bundle length is 7 to 8 inches.

$7.95/each



### GREY SAGE MINI BUNDLE                        8722
Our western desert Grey Sage is provided in this mini bundle wrapped in a 3 to 4 inch length. Excellent for personal use using an Abalone shell.

$4.00/each

### WHITE SAGE BUNDLE                            8713
White Sage from Southern California wrapped in a tight bundle ready for use. Bundle lengths average 7 to 8 inches

$7.95/each



### WHITE SAGE MINI BUNDLE                       8723
White Sage from Southern California is wrapped in a small 3 to 4 inch long bundle. Excellent for personal use using an Abalone shell.

$4.00/each

### WHITE SAGE & CEDAR BUNDLE                    8715
Mix of White Sage and Cedar wrapped in a tight bundle ready for use, 7 to 8 inches long.

$7.95/each



### WHITE SAGE & CEDAR MINI BUNDLE              8725
Mix of White Sage and Cedar wrapped in a small 3 to 4 inch long bundle.

$4.00/each



## SMUDGE KIT                                    8705



For an individual's use, this package includes a 3 inch braided piece of sweetgrass, a mini sage bundle, a 2 by 2 inch pack of dried flat cedar leaflets, a small Abalone shell, a quick-lite charcoal tablet, and a small feather to use as a fan to keep the herbals smoldering.

$10.95/each

### SWEET GRASS BRAID                            8711.++
Northern Sweet Grass collected in Dakota country, they are nicely braided and dried having a green, fresh look. Now offered in two thicknesses. The regular braid has about 30 pieces of grass and is loosely braided. The jumbo braid has twice the grass and is tightly braided. Average braid length is 24 inches.

01 Regular Braid                  $9.95/braid
02 Jumbo Thick Braid           $16.95/braid



### NATURAL SHELLS FOR CONTAINERS               5520.++
Used by many people as natural containers for smudging with sage and other herbals. Expect some variations in shape and color. The interior of the Abalone shells have a variation of shiny iridescent colors. The Quahog shell has a thicker shell. Inside they are matte white in the center with a shiny purple and white lip edge.
01 Small Abalone    $1.50/each
    *About 2½ to 3½ inches long*
02 Large Abalone    $7.50/each
    *About 5 to 6 inches long*
03 Medium Quahog $4.50/each
    *About 3 to 4 inches long*



### NECKLACE POUCH                               8610.***
Commonly referred to as a "Medicine Bag" these completed necklace pouchs are offered for those who are not able to do leather sewing. Made of deerskin leather, the bags are approximately 3 inches long and 2 inches wide at the widest. A leather thong is used to close the bag and hang it around your neck as a necklace. Now available in three colors.

153 Natural Tan  026 White  001 Black
$4.95 each



### FRINGED LEATHER POUCH                        8611.***
Sometimes a larger pouch is needed to store or carry items. This sewn up leather pouch is approximately 4 inches wide and 5 inches long with 3 inch fringe around the full edge. A long tie thong closes the top. We now have them available in three colors.

153 Natural Tan  026 White  001 Black
$9.95/each

**100.** "Ceremonies: The Indians held many kinds of ceremonies to ensure that they had enough food. Hunting tribes preformed ceremonies to keep game plentiful. The Plains Indians, for example, believed that the Buffalo Dance would ensure success in hunting buffalo *(see Buffalo Ceremonials).* The Sun dance ranked as the chief ceremony of the Plains Indians. The dance was performed to gain supernatural power or to fulfill a vow made to a divine spirit in return for special aid. Some men tortured themselves as part of this ceremony. A Sun Dance lasted several days. (See Sun Dance)."[77]

---

[77] The World Book Encyclopedia I Volume 10 Field Enterprise Educational Corporation 1976 U.S.A. pg.'s 122-123.

**101.** **Plaintiff held his religious beliefs sincere before even being accused of a crime:**

**102.** The Plaintiff was convicted of an alleged crime because of his religious beliefs and was at the crux of the situation when they prosecuted him.

**103.** In the Plaintiff's case this caused him to be incarcerated at WMCI on or around the 29th day of October 2018. The only evidence the state had to use were statements made only by *school employees* from Triumph High School which is a school for kids with problems. On the 17th day of October 2018, in question, Armajo's stepdaughter, Z.L., was sent to school. At some point during the day, the teacher asked Z.L. about her day. The teacher claimed to talk to all her students 15 minutes every day about their situations at home. This claim was false as Z.L., being a foreign born Chinese immigrant whose first language was Mandarin, was confused by the teacher's questioning.

**104.** Z.L. had a conversation with her Chinese Mother, Mei Armajo (MA), the night before about Armajo and the "*Native American Ceremony*" that had been performed by Armajo for her. MA and her daughter Z.L. were both adjusting to a new country as well as to the Native American culture they had recently become a part of due to the marriage of the Armajos.

**105.** MA had been falsely told that "Armajo had been arrested in Minnesota for touching two fourteen year-olds."[78] Therefore, MA was irresolute in her support of Armajo at that time.

**106.** The teacher asked Z.L. "Did [Armajo] touch you?" Complainant replied "yes," not understanding the question was referring specifically to sexual touching as opposed to innocuous touching of other non-sexual parts of the body. The teacher assumed what Z.L. was saying was that she was sexually abused. The teacher told the counselor what she assumed happened. The story worsened with additional telling(s), including to the responding officer, Detective Burch, who took a report of alleged sexual abuse of a minor. The whole report was a misunderstanding due to Z.L.'s limited knowledge of the English language and the school employees' presumptive jump to an accusatory conclusion.

**107.** On October 17, 2018, Armajo was arrested the same day accusation(s) were made. Z.L.'s Mother, MA, also made a confused accusation of sexual assault while being interviewed by law enforcement over the following weeks. The detectives performed an incomplete investigation at best. The reviewing Prosecutor did not follow through on finding more evidence to know if a crime had actually been committed. Armajo understands that the state only needs

---

[78] The Minnesota complaints' came from Two News Broadcasters who were over the age of 30 yrs. old.

"hearsay" W.S. § 6-2-311[79] to file charges because, in Wyoming, sex crimes are the easiest cases to prosecute. In that case charges should not have been filed nor should any conviction have been the result as Z.L. and Mei Armajo both said "*nothing had happened*" in statements and in trial after the language barrier had been cleared for them. (*During the offer of proof*). This statement was said outside the presence of the jury, had the jury heard this, Armajo would have been exonerated.

**108.**  The complexity of that case arose within two states (first in Minnesota and then in Wyoming) whose charges were similar in nature but different circumstances, which had to do with a "*Native American Ceremony*" [as] Armajo was convicted of second-degree sexual abuse of a [Minor] in Wyoming state court. In March of 2019, a COVID-19 worldwide lockdown protocol played a huge role in his case and was utilized as a way to deny Armajo due process. Denying not only counsel, but access to transcript(s) and other credible evidence. While he was detained in Minnesota on an Interstate Compact Detainer the Wyoming Supreme Court (WSC) affirmed his conviction on direct appeal. *See Armajo v. State*, 478 P.3d 184, 188 (Wyo. 2020). He pursued state habeas relief before the WSC upon returning back to Wyoming, without the "necessary transcript(s)" to do his appeals, which denied relief in toto. His efforts to obtain habeas relief in federal court failed due to not having "transcript(s) and/or other credible evidence" to sharpen the scope of his appeals. Including claims based on ineffective assistance of counsel during his detention in Minnesota. The 404(b) evidence that was used against him was no good. The case in Minnesota was dismissed with prejudice. Regardless, the Plaintiff's case in Wyoming used that information in the District Court's findings to cause a defective bind over. In essence all appeals have also failed. Although, being prosecuted and convicted for his beliefs this doesn't stop the plaintiff's beliefs or practices being falsely accused and convicted of a crime that the plaintiff did not even commit.

**109.**  The Plaintiff continues to practice "the religion of American Indians their inherent right of freedom to believe, express, and exercise their traditional religions." A system of moral values and beliefs about the meaning of life and the sole purposes why we are put on this earth as human beings, which he subscribes to being a "Holy Man," a "Child of God, sent to earth from

---

[79] ("Corroboration of a victim's testimony is not necessary to obtain a conviction for sexual assault."). {432 P.3d 499}, *Martinez v. State* (Wyo. 2018).

The Great Creator" and an affirmative naturalistic outlook on the "Native Ceremonial Healing"; "an affirmative recognition of ethical duties"; and "a strong commitment to human rights."

110. The religion of American Indians "has a structure akin to many religions, with clergy/celebrants who perform weddings, funerals, ceremonies, counseling, doctoring healings etc...., and natural medicine as well many other functions or clergy." Using clays of all colors, corn pollen, sand paintings, Ashes, Oils, and Holy Water.



**Ashes**
Serves 500 People
**61807** • Only $15.99 bag

OE2JOB: 2dr Job oil
$3.95

Prices and availability valid as of June 29, 2022
OEGYC: Egyptian Musk Oil 2
dram
$7.95

111. The Native American Society is a religious, educational, charitable organization, which was the first established religion known to this continent in North and South America. The many diverse religions in the Native American communities form their own traditions and practices. There are over 574 recognized different tribes in USA,[80] who all practice different costumes set by the members of their community. A lot of which had been lost due to the new age. The tribes issue Ids and trains and certify people who are accorded the rights and privileges granted to priests, ministers, and rabbis of traditional religions. Native Americans observe several holidays (for instance, "Sundance's" in August, Spirit Quest's, and "Sweat's" during the solstice-related holidays), and live according to the principles outlined in their guiding document known as *"Spiritual Violations."*[81]

112. Native American Indian's stand on the grounds of **PL 95-341**,[82] The American Indian Religious Freedom Act, as justification to preform Native Healing Ceremonies and Traditional Ceremonies.

---

[80] National Congress of American Indians, Tribal Nations & the United States: an Introduction, Available online at: https://ww.ncai.org about-tribes./
[81] NATIVE HEALER INITIATION INTO AN ANCIENT ART. By, Medicine Grizzlybear Lake pg. 197, 198, 199.
[82] {2004 U.S. Dist. LEXIS 9} The ROD also announced a change in the Klamath Forest Plan Standard 24-25. (AR 19984.) The old Standard provided: "Protect traditional Native American rights and practices (Public Law (PL) 95-

## RACIAL/RELIGIOUS DISCRIMINATION ALLEGATIONS

**113.  Racial/Religious Discrimination & Retaliation Violations at WMCI:**

The Fourteenth Amendment of the United States Constitution states "All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**114.** Plaintiff seeks an order declaring Defendants' policies and practices which discriminate on the basis of race and religion to be unlawful; enjoining Defendants from engaging in practices which discriminate on the basis of an individual's membership in a protected class or classes, and which retaliate against the race of inmates, in this case, Native American, and retaliation for engaging in the lawful practice of worshiping in the traditional beliefs of the Native American People. The Defendants' actions are unlawful under United States law; requiring the Defendants to compensate the Plaintiff for the destruction of his sacred religious property, they could have simply given back his sacred religious property and not destroyed it. The unlawful discriminatory actions of the Defendants in restricting the Plaintiff's practices/worship, and destruction of sacred religious property, requires the Defendants to compensate the Plaintiff for damages suffered by them, requiring Defendants to pay Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**115.** Plaintiff is a male Native American Christian (NAC) member, born on February 8, 1984, who practices the religious beliefs of the Native American Peoples. Defendants have an overarching problem that Native Americans face in the penal system, and there is the confusing pattern of federal laws that regulate so many of their activities. No other ethnic group is so heavily regulated.

**116.** Plaintiff was incarcerated at WMCI in the Wyoming Department of Corrections on or around February of 2019, and is still presently incarcerated.

**117.** During incarceration, Plaintiff is one of many Native American male inmates of WDOC.

---

341) to insure the integrity of the site and to assure that the use will continue to occur and will not be impaired." (FEIS at {306 F. Supp. 2d 937} 4-77.) The new Standard states: "Protect traditional American Indian cultural and religious uses and practices consistent with Public Law 95-341 (American Indian Religious Freedom Act of 1978)." (AR 19984.)

**118.** On or around November 2022, Plaintiff was transferred to WMCI where Defendant Norris of WMCI was the Deputy Warden at the Wyoming State Penitentiary.

**119.** At all relevant times herein, Plaintiff performed his Native American ceremonies religiously and without significant disciplinary action or violating the safety or security of the facility, and with no negative altercations complained of.

**120.** At the time of his appeals, Plaintiff was subjected to differential treatment in the terms and conditions of having his sacred religious property to worship taken and destroyed, including, without limitations, the conditions and qualifications of his beliefs of the Native American Peoples; the expectations of inmates; and restrictions on his personal sacred religious property when he was not worshiping due to the death of Willie LeClair. Defendants, white male Warden Seth Norris, along with white male Security Guard Landen Sanders, generally or similarly situated with the white male Director Daniel Shannon were not restricted in their beliefs without a legitimate governmental interest or security reasons for the differential treatment accorded him.

**121.** The Plaintiff arrived at WMCI in 2022; the Warden Seth Norris also transferred to WMCI from WSP in 2022. Since then, Plaintiff was subjected to a hostile environment, discriminated against based on his race and religion. Based on his being Native American, the staff, including corrections officers and co-employees, participated in retaliation and discriminatory actions, which included, without limitation, open hostility and disrespect, false allegations, write-ups concerning his placement at WMCI, manipulating the point system to have the plaintiff sent back to WSP because of his level of points and write-ups which are frivolous, and using the SOTP attendance policy as a way to retaliate and have him perjure himself. So they can have his conviction solidified due to being coerced into a false confession, which this allegation could be factually substantiated, arising out of their resentment because the plaintiff was actively working on his appeals, which hostile environments was fostered by the Defendant's supervisors.

**122.** The hostile environment to which Plaintiff was subjected to was real and pervasive; it affected the way he was treated and when it came to his sacred religious property being taken and conditions of worshiping; was intentionally fostered as an attempt to stop the Plaintiff from doing his appeals which in no way affects the safety or security of the facility.

**123.** Defendant Shannon, the director who supervises the Defendants Norris, Sanders, and is in charge of the Plaintiff, knew or reasonably should have known, and would have known had

they undertaken any semblance of an effective investigation into the discriminatory motivations underlying these allegations, responded to these founded allegations by subjecting Plaintiff to racial discrimination monitoring and disciplinary actions (Conduct Violation Reports (CVRs)) in furtherance of the hostile environment to which he was subjected.

**124.** Plaintiff has been racially discriminated against by the Defendants. These violations are defined by and pursuant to 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), 42 U.S.C. § 1997 the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq., and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2).

> "A condition in which some observers believe, as one noted Indian activist has asserted, that the "American policy toward the Indians has always revolved around the same central theme: how can 'we,' the superior, enlightened, Christian people, help/destroy 'them,' the inferior, uncivilized, pagan people; in such a way as to eliminate. . . Indian people as members of distinct societies."[83]

**125.** Defendants were on notice of Plaintiff's religious practices, and his position as a Holy Man, which did not interfere with the safety or security of the facility, and did not require any accommodation therefor, since his arrival in 2022, when Plaintiff was doing ceremonies in sweats.

**126.** On August 2, 2023, a white male Corrections Officer serving as a Security Guard under Defendant's supervision took the Plaintiff's sacred religious property, because of his Christian beliefs not being the of the same kind as the Plaintiffs. The so called 'Confiscation Contraband' of the sacred religious property was done under the control and the direction of Prison Warden Seth Norris who, on the basis of this ongoing retaliation/harassment, prevented Plaintiff from the use of his sacred religious property, the ability to worship, and to attend sweats due to Willie previously passing away at WSP earlier that year in 2023. (See: **Exhibit 3** WDOC Form #307 Notice of Confiscation).

**127.** The Plaintiff objected to the memorandum (#23-154. August 25, 2023.) Received from Jennifer Emigh, the Grievance Manager, and her conclusion that the Plaintiffs religious sacred property was Contraband using policy 3.006[84] to deny the plaintiff the right to worship. WDOC has many ways to deny whoever they want to harass, or pick on, such as the Plaintiff when he

---

[83] Robert B. Porter, A Proposal to the Hanodaganyas to Decolonize Federal Indian Control Law, 31 U.MICH. J.L. REFORM 899, 921 (1998).
[84] General Contraband: Any item or Article which is altered without authorization, put to an unauthorized use, or taken into an unauthorized area.

was working on his appeals. Claiming "*policy and procedures*" to deny the plaintiff his religious rights. When that doesn't work, the next best thing would be to claim it as the "*safety or security of the facility*", a catchall phrase used to avoid being in the wrong.

**128.** WDOC operates on these policies and allows these violations to occur without explanation. The Defendants had been on notice of this kind of behavior since April 6, 2021. Ever since the Plaintiff came back from Minnesota, after that case was dismissed. Plaintiff was trying to receive transcripts and was denied, all while the retaliations were happening at WSP. When the Plaintiff responded to WMCI taking the sacred religious property, he told the Defendants that denying him his sacred religious property was denying his rights under the First Amendment right to worship and the Fourteenth Amendment.

Definition of Equal Protection: 14th Amendment of the United States Constitution. In theory it means that you have a right to be treated the same as other similarly situated prisoners in the same prison. See *Shaw v. Murphy*, 532 U.S. 223 (2001) quoting, *Turner v Safley*, 482 U.S. 78 (1987), four **(4)** pronged test.

**1.** Whether there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it;

**2.** Whether there are alternative means of exercising the right that remain open to prisoners;

**3.** The impact that accommodation of the asserted right will have on correctional officers and inmates, and on the allocation of prison resources generally; and

**4.** The existence of ready alternatives to the regulation.

**129.** Defendant Sanders said to the Plaintiff that Sanders' "beliefs were not part of his religious Christian beliefs," and that he "did not care that the Plaintiff used these sacred items for religious ceremonies." And to "grieve it" knowing full well that the Plaintiff would never receive the sacred religious items to worship back.

**130.** On information and belief, the white male Defendants, and similarly situated other white imamates are not regarded as problem inmates because of their beliefs and working on their appeals. None of which affects the safety or security of the facility, nor does it threaten the staff because of Plaintiff's ability to help adherents with their problems that they suffer from. The defendants used discriminatory treatment on the basis of Plaintiffs beliefs which had no impact on the facilities operations.

**131.** Immediately following this incident, the Warden and other Staff under his supervision, engaged in a pattern of ongoing employee harassment against Plaintiff, including, but not limited

to: subjecting him to a plethora of discriminatory CVRs; unsuccessful attempts to coerce self-incrimination upon the Plaintiff by using the Sex Offender Treatment Program (SOTP), Parole Board members being used as a weapon to enforce their abuse by threating to "flatten his sentence" with the Board's help. Plaintiff pointed out to them that threating to flatten his sentence was done as retaliation because Plaintiff was doing his appeal(s), and was denied his transcripts, hindering his ability to properly appeal. The Warden stated to the Plaintiff "that he did not need the transcripts because, Plaintiff was convicted by a jury and that he already received due process in court, and that is all the due process he will receive." [85] This was the reason for the denial of the necessary transcripts, which was a blatant denial of due process on the defendant's part.

("Prison authorities are required to assist inmates by providing meaningful access to the courts." See: *Bounds v. Smith,* 430 U.S. 817 (1977); *and Lewis v. Casey,* 518 U.S. (1996)).

**132.** On September 15, 2023, the Defendant Warden Seth Norris issued his conclusion: "I find the items were confiscated in accordance with policy and procedure.[86] I encourage you to communicate with the property department concerning the disposition of those items." The Memorandum to the Plaintiff clearly condones Defendant Sanders actions. (See: **Exhibit 4** Wardens Memorandum).

**133.** The actions of the Defendants were purely Religious Discrimination & Retaliation in nature and were not authorized by WDOC policy or its customs.

Prison officials may not retaliate against an inmate for exercising his constitutional rights. See *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). "This principle applies even where the action taken in retaliation would be otherwise permissible." *Smith v. Maschner*, 899 F.2d 940, 948 (10th Cir. 1990).

In order to state a cognizable retaliation claim, Plaintiff must allege specific facts that demonstrate: **(1)** he was engaged in constitutionally protected activity, **(2)** Defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and **(3)** Defendants' adverse actions were substantially motivated as a response to Plaintiff's constitutionally protected activity. *See Shero v. City of Grove*, 510 F.3d 1196, 1203, (10th Cir. 2007); *Allen v. Avance*, 491 F. App'x 1, 6 (10th Cir. 2012).

---

[85] A state and its officers cannot abridge or impair a prisoner's right, given by federal law, to apply for a federal writ of habeas corpus. *Ex Parte Hull*, 312 U.S. 546 (1941).
[86] According to form #355, all spices and herbs must be marked similarly to the religious oils, and remain in a "clear plastic bottle or bag". WDOC Form #355 Unified Matrix for Authorized Personal Religious Property Pg. 2 of 3.

**134.** Plaintiff was threatened with a CVR for singing and praying in the shower "in his Native Tongue". The threat was allegedly based on "recent complaints from WMCI Staff" who called these actions "nuisance religious music chanting". White employees and inmates who made specific biblical references, discussed religious topics, or played religious music at WMCI were not similarly disciplined.

**135.** In Seth Norris' capacity as Warden, Defendant was charged with the responsibility and obligation of complying with and enforcing the State of Wyoming's policies and procedures, including its policies relating to discrimination and harassment.

**136.** On September 27, 2023, Plaintiff then filed his appeal to the Defendant Director Daniel Shannon, the Prison Operations Administrator, who acknowledged that they were aware of the religious property that was confiscated and he neither otherwise commenced an investigation into the report nor took remedial action himself, but relied on what his staff here at WMCI told him. (See: **Exhibit 5** Grievance appeal #23-154).

**137.** Subsequently, there is a difference between 'buying' Spiritual Medicine vs. being 'given' Spiritual Medicine from spiritual leaders. 'Given' medicines are gifts from the sacred way. Buying medicine in the Native way is called "Hayaa Medicine" and is not considered sacred. When Native Americans went to gather the herbs they used, they would fast and pray for three days and three nights. This is called a "spirit quest". They would make offerings to the Great Creator for help, etc. Nowadays, since Western Medicine came about, it all boils down to the amount of money one spends that offers you medicine or cures. Money, in the Native Way, corrupts the religious items and it corrupts the Body, Soul, and Mind if the medicine is bought. Now, if the facility WDOC buys these items for the Native American Group, instead of the Native American Group or Individual Adherents buying them, and given as a gesture of kindness, then the items may be used for religious purposes because it nulls and voids the Western way of Medicine practices. The Medicine then becomes sacred again, because it is given in the Sacred way.

**138.** Plaintiff asked the Warden and the Corrections Officer's supervisor for the sacred items to be given back. Plaintiff made a formal request for an investigation into the taking of sacred religious property. In response, the Defendants Shannon and Norris, actively allowed the Defendant Sanders from giving back these sacred items. Even the property supervisor used their authority to refuse giving to the sacred items back. Plaintiff was subsequently advised by the

WDOC Property Manager that the property was destroyed. Prior to the items being destroyed the Plaintiff explained that the Medicine was spiritually attached to him and could not be shipped or given to anyone else as it would cause harm to the receiver or the person destroying the sacred items. Woe to the person who takes or destroys Holy Mans sacred items. The karma will be on them because they desecrated the sacred items used for ceremonies that have spirits. (See: **Exhibit 6** communication form to the property manager).

139. Although Defendants conducted an investigation into the Plaintiff's report concerning the officer, Defendants did not do anything to remedy the discriminatory actions of Defendant Sanders, which included allegations of racial and religious discrimination. There is no legitimate penological justification for WMCI's policy and practice of denying the right to worship and religious property.

140. The Plaintiff was left without the ability to worship, [as] his sacred property was gone. A Holy Man cannot perform the correct rituals without the use of these sacred items, to help those adherents who are sick and afflicted, within the walls of WMCI. This place is a hospital for the sick and afflicted who need help and this is the reason why the Plaintiff is needed here for a short period of time. It is to assist those who are here for Native American Spiritual help, or else He would not be here. The Creator placed him here for a short period of time and he will pull him out of here when the Creator needs him elsewhere.

141. Defendants have no legitimate business or governmental reason for the actions to which it subjected the Plaintiff, including without limitation: hostile environment discrimination, campaign of disciplinary actions, and taking of religious sacred property. Which actions were undertaken because of his Race and Beliefs, and other protected statuses, and in retaliation for the plaintiff having engaged in protected activity as defined by 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), 42 U.S.C. § 1997, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq., and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2).

142. As a direct and proximate result of Defendant's conduct in violation of 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), 42 U.S.C. § 1997, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq., and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2).

**143.** Plaintiff has suffered damages including: loss of his religious sacred property; loss of his right to worship, including opportunities lost during the time it took to find a "spiritual advisor". Officer Beck, who was immediately available, could have done the services for the Native American Group. Not having these services caused severe and emotional distress resulting from his denigration on the basis of his race and religion; and as having been falsely regarded as a problem inmate to the extent that he could not Worship the way he was required to, and the loss of the sacred items affected the way he is able to help others. The sacred items are irreplaceable due to Willie LeClair being deceased.

**144. "Class-of-One" Racial Discrimination Evaluation:**

WMCI touts its self as "Nondiscrimination towards Inmates (Policy #3.403) WDOC policies and practices ensure no form of unlawful discrimination takes place against inmates in correctional facilities. Programs, services, and institutional privileges are offered on a nondiscriminatory basis. *Id.* "No inmates under the jurisdiction of the WDOC will be subject to discrimination based on ***race***, ***religion***, national origin, gender, disability, or political beliefs in making administrative decisions and in providing access to programs." *Id.* In our United States Constitutional Scheme the Plaintiff has the right to his sacred religious property under the Fourteenth Amendment the right to "Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Fogle v. Pierson*, 435 F.3d 1252, 1260 (10th Cir. 2006) (quotation and citation omitted). The Complaint does allege a class or group affiliation, thus, if it states a claim at all, it must be under a "class of one" theory. See *A.M. v. Holmes*, 830 F.3d 1123, 1166 (10th Cir. 2016). A "class of one" equal protection claim exists when a plaintiff shows "he or she has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Id.* (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)). "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'" *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quoting *Coal. For Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008)). "It is ... imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the allegedly favored class." *Holmes*, 830 F.3d at 1167 (quotation marks, citation, and brackets omitted).

**145. The States Eleventh Amendment Immunity Challenges to the Plaintiff's case.**

**The Eleventh Amendment to the United States Constitution states as follows:**

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. amend. XI. "Eleventh Amendment immunity's primary purpose is to accord states the respect owed them as joint sovereigns." *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1252 (10th Cir. 2007). "Consequently, state sovereign immunity applies to any action brought against a state in federal court, including suits initiated by a state's own citizens."

In addition to barring suits against a state, "[t]he Eleventh Amendment bars federal court jurisdiction over a state agency for both money damages and injunctive relief, or a state official acting in her official capacity in a suit for damages...." *Hobbs v. Oklahoma State Penitentiary*, 673 F. App'x 837, 839 (10th Cir. 2016) (internal quotation omitted) (ellipsis in original). "An effectively raised Eleventh Amendment defense deprives a court of subject-matter jurisdiction." *Richeson v. Weiser*, No. 22-1383, 2023 WL 2003396, at *1 (10th Cir. Feb. 15, 2023) (unpublished) (citing *Harris v. Owens*, 264 F.3d 1282, 1288 (10th Cir. 2001)).

"A state, and its agencies, have immunity from suit under the Eleventh Amendment, and thus cannot be sued in federal court by a private individual with three exceptions: **1)** the state consents to suit; **2)** Congress expressly abrogates the states' immunity; or **3)** *the citizen sues a state official pursuant to Ex Parte Young*...*" Callen v. Wyoming Dept. Corr.*, 2014 WL 11365868, *11 (D. Wyo. July 2, 2014) (citing *Ex Parte Young*, 209 U.S. 123 (1908); *Opala v. Watt*, 454 F.3d 1154, 1157 (10th Cir. 2006) cert denied, 549 U.S. 1078 (2006)). Here, the state has not consented to this action (*Wyo. Guardianship Corp. v. Wyo. State Hosp.*, 428 P.3d 424, 433 (Wyo. 2018), nor has Congress abrogated the states' immunity for § 1983 claims (*Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989), therefore the only exception for Plaintiff's action against Defendants to succeed, is under the *Ex Parte Young* exception. This exception applies to lawsuits where the plaintiff is seeking prospective injunctive relief against state actors. *Ex Parte Young*, 209 U.S. 123, 159-60 (1908); *Buchheit v. Green*, 705 F.3d 1157, 1159 (10th Cir. 2012). A request for injunctive relief is prospective if the complaint seeks relief from an ongoing violation of federal law. *Buchheit*, 705 F.3d at 1159.

The Eleventh Amendment bars the claims against the State in this Court. *Steadfast Ins.* 507 F.3d at 1252. Further, as this Court and the Tenth Circuit Court have held on numerous occasions, WDOC is a Wyoming *state agency* covered by the Eleventh Amendment. See, e.g., *Halcomb v. Wyo. Dept of Corr.*, 20-CV-241-SWS, 2021 WL 7211093, at *3 (D. Wyo. Oct. 1, 2021); *Carter v. Wyo. Dept Corr. Classification & Hous. Manager*, 22-8044, 2022 WL 7238406, at *2 (10th Cir. Oct. 13, 2022) (unpublished); *Callen v. Wyo. Dept of Corr.*, 608 Fed.App'x 562, 565 (10th Cir. 2015). While Eleventh Amendment immunity may be abrogated by Congress or waived by a state, neither has occurred here. See *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996); *Sossamon v. Texas*, 563 U.S. 277, 284 (2011). It is well-established that § 1983 does not abrogate the states' sovereign immunity. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). Likewise, "[t]he State of Wyoming has not consented to suit under 42 U.S.C. § 1983." *Wyo. Guardianship Corp. v. Wyo. State Hosp.*, 428 P.3d 424, 433 (Wyo. 2018) (citing Wyo. Stat. Ann. § 1-39-104); accord *Chapman v. Wyo. Dep't of Corr.*, 366 P.3d 499, 512 (Wyo. 2016).

**Furthermore**, 42 U.S.C. § 1983 provides in pertinent part as follows:

Every **person** who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. (**Emphasis added in the original**).

"Persons" Subject to Suit Under § 1983 Additionally, State Defendants move to dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted." State Defendants would try to argue that because they are not "persons" subject to claims under § 1983, Plaintiff's § 1983 claims would fail as a matter of law. The United States Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, Plaintiff's § 1983 claims against State Defendants in their official capacity fail as a matter of law. *Stone v. Simone*, 2014 U.S. Dist. LEXIS 185954, at *10-12 (D. Wyo. July 7, 2014) (dismissing § 1983 claims against the State of Wyoming); *Chavez v Wyo. Dep't of Corr.*, 2005 WL 8155898, at *9-11 (dismissing § 1983 claims against the Wyoming Department of Corrections).

**Policy or Custom Violation exceptions:**

Furthermore, while the Supreme Court has provided an exception to this rule, that a State or its officials may be held liable for § 1983 violations committed through enforcement of a ***policy or custom***, Plaintiff's complaint contains factual allegations asserting a claim based upon enforcement of a policy or custom. ***Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("when execution of a government's policy or custom… inflicts the injury… the government as an entity is responsible under § 1983.").**

## PLRA & WYOMING GOVERNMENTAL CLAIMS ACT PROCEDURE

**146.** The Prison Litigation Reform Act ("PLRA") provides as follows: "No action shall be brought with respect to prison conditions under [42 U.S.C. §§ 1983, 1997], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Pursuant to that Act, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). To exhaust administrative remedies, an inmate "must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* at 218.

**147.** The Wyoming Department of Corrections has an established inmate grievance system, known as WDOC Policy #3.100, *Inmate Communication and Grievance Procedure*, which includes the following steps:

**148.** WDOC FORM #320, *Inmate communication Form*;

**149.** WDOC FORM #321, *Inmate Grievance Form*;

**150.** WDOC FORM #322, *Inmate Grievance Appeal Form* to the Warden or Facility CEO; and

**151.** WDOC FORM #322, *Inmate Grievance Appeal Form* to the Director of the Wyoming Department of Corrections.

**152.** The Petitioner filed each form in the appropriate time frames and received a response for each step of the grievance process, whereby exhausting the inmate grievance procedures available to him by the Wyoming Department of Corrections.

**153.** No further administrative remedies are available to the Petitioner related to the issues presented in this Compliant.

**154.** Petitioner asserts that the requirements of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e (a), with regard to the exhaustion requirement, have been satisfied.

**155.** <u>The Wyoming Governmental Claims Act Procedure</u>.

**156.** Plaintiff has complied with the Governmental Claims Act, including the requirements of Wyoming Statutes § 1-39-113.

**157.** On January 15, 2025, Plaintiff filed a timely charge of Religious/Racial discrimination with the Wyoming Department of Administration and Information, General Service Division, and Risk Management Section.

**158.** On February 18, 2025, the Wyoming Department of Administration and Information, General Service Division, and Risk Management Section denied a *Notice of Right to Sue* authorizing Plaintiff to file a private action in a court of competent jurisdiction, which was received by Defendant on February 26, 2025. A true and correct copy of the *Notice of Right to Sue* is attached hereto as **Exhibit 7. (State Claim No: 080-EO-24-0012878).**

**159.** This action is timely filed within the two years (2) years of the issuance of the *Notice of Right to Sue*.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF

**Free Exercise of Religion, Conscience and Tradition**

**– Violation of Plaintiff's First & Fourteenth Amendment Rights –**

(Against Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders)

**160.** Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

**161.** Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders are persons under 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. § 1997 who

at all times relevant to this claim, were acting under color of state law in their actions and inactions.

**162.** At all relevant times, Director Daniel Shannon, Warden Seth Norris, and Landen Sanders were WDOC's Director, Warden, and Officer responsible for the safety and security of the facility and for Plaintiff housed in WMCI and subjected Plaintiff to the loss of Sacred Religious Property. Specifically, Defendant Sanders subjected Armajo to the loss of his sacred religious property and ability to worship with his religious property in pod D-2; Defendant Norris subjected Armajo to loss of sacred religious property and ability to worship at WMCI; Defendant Shannon subjected Armajo to the loss of his sacred religious property and ability to worship within WDOC's facilities, specifically WMCI. Upon information and belief, other WMCI staff also personally participated in subjecting Plaintiff to the loss and destruction of sacred religious property as well the ability to worship how others are accorded.

**163.** At all relevant times, Defendant Shannon was the Director and responsible for approving Plaintiff's placement at WMCI. Defendant Shannon's responsibilities as the Director included, "[m]aking provisions that ensure the safety, security and well-being of residents and staff involved in the situation; and "[e]nsuring the resident's physical, spiritual, mental health, and safety needs can reasonably be met by [WMCI]." Defendant Shannon personally participated in approving Plaintiff's loss and the destruction of said sacred religious property and the ability to worship within WMCI and was directly responsible for the Plaintiff's care while held at WMCI.

**164.** Defendants, by act or omission, deprived Plaintiff of the minimal civilized measure of life's necessities and have violated his basic human dignity and right to **Free Exercise of Religion, Conscience and Tradition** under the First and Fourteenth Amendments of the United States Constitution.

**165.** Defendants have a policy, practice, or custom of routinely using the confiscation method on Plaintiff's religious property at WMCI without lawful purpose. As described above, Defendant's practice of confiscating the sacred religious property subjected Plaintiff to the loss and ability to worship how others are afforded the ability to worship. The denial and destruction of the Plaintiff's sacred religious property denied the Plaintiff's ability to access and to worship in his traditional ways of the Native American Peoples and lack of access to meaningful **Free**

**Exercise of Religion, Conscience and Tradition**. Defendant's practices and policies created a substantial risk of serious emotional and psychological harm to Plaintiff.

166.  The cumulative effect of denying a religious right, particularly on the Plaintiff, constitutes a serious deprivation of basic human needs, including but not limited to **Free Exercise of Religion, Conscience and Tradition**. The denial of the sacred religious property also strips human beings, particularly Plaintiff, of his basic dignity and humanity in violation of contemporary standards of human decency and constitutes a denial of the ability to worship how others in similarly situated situations are able to worship and is prohibited by the First and Fourteenth Amendments.

167.  Defendants were aware of the extreme conditions of denying a religious right, as well as the substantial risk of harm to a person's mental and spiritual needs that is attendant to conditions of confinement.

168.  Defendants were aware that the risk of harm to a person's mental and spiritual needs while in WMCI is more acute for people like Plaintiff who is in need to be able to worship.

169.  That WMCI's policies and practices violated contemporary standards of human dignity and decency are evidenced by the fact those practices are unusual in comparison to other states' practices with respect to the treatment of Plaintiff a Native American Practitioner, and Adherents in the penal justice settings. Other states prohibit the abuse and use of taking and destroying sacred religious property from worshipers. Additionally, several other states prohibit the use of religious/racial discrimination for *any person* with abilities such as the Plaintiff who is a Practitioner in the Native American way, regardless of their beliefs. Further, the internal community condemns the practice of denying a religious right to worship under the conditions that exist at WMCI.

170.  Defendants acted with deliberate indifference in that they knew or should have known that denial of **Free Exercise of Religion, Conscience and Tradition** posed a high risk of harm to the Plaintiff and did in fact destroy Plaintiff's sacred religious property. Yet, Defendants failed to take reasonable steps to prevent such harm. Moreover, Defendants are aware of the substantial risk of serious harm that the plaintiff suffered as a result of these practices and policies. Defendants' actions and inaction are indifference to known spiritual and safety needs of Plaintiff.

171.  Defendants' actions and inaction shock the conscience and acted with attitude of indifference that exceeded negligence to serious known denial of **Free Exercise of Religion,**

Conscience and Tradition needs of the Plaintiff and creates a substantial risk of serious harms in violation of Plaintiffs' rights under the Fourteenth Amendment.

172. The acts and omissions of Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders were the legal and proximate cause of Plaintiffs' injuries.

173. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and costs as allowable by federal law.

174. Plaintiff is entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully, or with reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. § 1997**

**Plaintiff was discriminated against on the basis of his religion**

**– Under the Fourteenth Amendment –**

(Against Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders)

175. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

176. Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders are persons under *42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. §1997,* who at all times relevant to this claim, were acting under color of state law in their actions and inactions.

177. Plaintiff, as a Holy Man in the custody of the state, had a clearly established right under the Fourteenth Amendment of the United States Constitution to be secure in their persons against the deprivations of life, liberty, or property without due process of law, including through the use of destroying sacred religious property.

178. At all relevant times, Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders personally participated in subjecting Plaintiffs to objectively unreasonable religious/racial discrimination and denial of the right to **Free Exercise of Religion, Conscience and Tradition**. For example:

a. Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders each restricted Plaintiff from his sacred religious property while he was in WMCI's Pod D-2. During a 'shakedown' Sanders confiscated the sacred religious property and denied Plaintiff his right to

worship, specifically, being kept from sweats, and practicing his traditions. Defendants retaliated against Plaintiff for actively working on his appeals by taking his sacred religious property, knowing that Plaintiff uses this sacred religious property for Ceremonies, causing Plaintiff to be denied his First and Fourteenth Amendment right to **Free Exercise of Religion, Conscience and Tradition**.

**b.** Defendant Sanders confiscated the sacred religious property.

**c.** Defendant Norris is the Warden and is the controlling senior officer on duty who could have had given back the sacred religious property, but, failed to do so, and allowed the treatment of his staff's ongoing harassment and destruction of said sacred religious property.

**d.** Staff member and property manager Sgt. Ross destroyed the sacred religious property according to policies after Plaintiff filed all his grievances and was denied in all of his appeals to the director for his sacred religious property to be given back.

**e.** Defendant Shannon allowed the racial/religious discriminatory actions of his staff against Plaintiff and his sacred religious property.

**f.** Defendants improperly denied Plaintiff his ability to worship like how others are afforded in similar situations.

**179.** Upon information and belief, other WMCI staff also personally participated in subjecting Plaintiff to excessive and unlawful religious/racial discrimination.

**180.** Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders use of taking and destroying the sacred religious property were objectively unreasonable under the circumstances.

**181.** Defendant Shannon, as the Director, approved or condoned Defendants Norris' and Landen Sander's unreasonable taking/destruction of sacred religious property and denial of the ability to worship.

**182.** Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders were either active participants or failed to intervene in the taking and destruction of sacred religious property that was objectively unreasonable under the circumstances.

**183.** Defendants were aware that the denial of the ability to worship with sacred religious property was used as a form of punishment/retaliation to impose serious psychological pain and suffering.

**184.** Defendants' denial to **Free Exercise of Religion, Conscience and Tradition** stripped the Plaintiff of his basic dignity and humanity in violation of contemporary standards of human decency.

**185.** Defendants were aware of the risks of taking the sacred religious property and destroying it was a denial to worship, but disregarded their knowledge of the risks to Plaintiff right under the Fourteenth Amendment.

**186.** Defendants' actions and inaction shock the conscience and acted with attitude of indifference that exceeded negligence to serious, known spirituality needs of adherents, and create substantial risks of serious harms in violation of Plaintiffs' right under the Fourteenth Amendment.

**187.** The acts and omissions of Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders were the legal and proximate cause of Plaintiffs' injuries.

**188.** Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and costs as allowable by federal law.

**189.** Plaintiff is entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully, or with reckless or wanton disregard of the constitutional rights of Plaintiffs.

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. § 1997**

**– Fourteenth Amendment Clause to Equal Protection –**

(Against Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders)

**190.** Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

**191.** Defendants Director Daniel Shannon, Warden Seth Norris, and Landen Sanders are persons under 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. § 1997 who at all times relevant to this claim, were acting under color of state law in their actions and inactions.

**192.** Plaintiff had a clearly established right to equal protection under the Fourteenth Amendment to Free Exercise of Religion, Conscience and Tradition.

**193.** With respect to Plaintiff, Director Daniel Shannon, Warden Seth Norris, and Landen Sanders knew of his need to have his sacred religious property, so that he would be able to

49

worship after Willie LeClair died. Nonetheless, they took and destroyed the sacred religious property, with deliberate indifference, and decided not to allow him to worship in the way of his Native American beliefs. Defendants' treatment (or lack thereof) was in reckless disregard to a substantial risk of physiological harm to Armajo. Defendants continued to act in bad faith and with deliberate indifference to Armajo's serious needs to worship in his sincerely held beliefs of the Native American Traditions, and constitutional rights, when they willfully denied him the ability to worship how others are afforded in similar situations. Armajo repeatedly requested the defendants to provide him with his sacred religious property so he could worship.

**194.** Additionally, Defendant Landen Sanders took the sacred religious property from the Plaintiff because, "the Plaintiff's beliefs were not part of his religious Christian beliefs," and that he "did not care that the Plaintiff used these sacred items for religious ceremonies," taking the religious property because it was not how the Defendants worshiped or practiced. The Plaintiff told the Defendant that "his sacred property helps him bless and heal the sick and afflicted, and that the items have spirits themselves that helps the individuals heal or be cured of their demon possessions, based on Plaintiff's beliefs, and abilities to use the sacred spiritual items to heal the sick and afflicted during 'Sweat Ceremonies' etc…;" The Defendant then told the Plaintiff to "grieve it." Denying the plaintiff his sacred religious property caused a list of systematic and emotional abuse as well the loss of the ability to worship how and in the way the Plaintiff wants.

**195.** The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and were moving forces and substantial significant contributing proximate causes of Plaintiff's injuries.

**196.** As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling him to compensatory, punitive, and nominal damages including attorneys' fees in amounts to be determined at trial.

**197.** As a direct result of Defendants' unlawful conduct, Plaintiff has suffered significantly to the loss and ability to worship entitling him to compensatory, punitive, and nominal damages, including amounts to be established at trial.

**198.** As a direct result of Defendants' unlawful conduct, Plaintiff has also suffered lost sacred religious property which impaired his ability to worship in the ways of his traditional beliefs of the Native American peoples, and damages are to be awarded amounts to be ascertained in trial.

**199.** Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**200.** Plaintiff is entitled to punitive damages under **42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. § 1997** in that the actions of Defendants were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. § 1997**

**– Fourteenth Amendment Right to Due Process –**

(Against Defendant Landen Sanders)

**201.** Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

**202.** Defendant Sanders is person within the meaning of 42 U.S.C. § 1983, Title 28, U.S. Code, section 1343(3), and 42 U.S.C. § 1997.

**203.** At all relevant times, Plaintiff had a constitutionally protected interest under the Fourteenth Amendment to receive due process.

**204.** Defendant Sanders deprived Plaintiff of his liberty interests without due process of law by denying him meaningful and Free Exercise of Religion, Conscience and Tradition and a meaningful way to worship with his sacred religious property, in violation of the Fourteenth Amendment.

**205.** The conditions and duration of Plaintiff's denial to worship is a denial of his due process rights within WMCI. While being held in confinement, this constitutes an atypical and significant hardship compared to the ordinary incidents of WMCI due to the exceedingly racial and religious harassment conditions plaintiff suffered.

**206.** Because the taking and destroying of sacred religious property constitutes significant and atypical hardship, plaintiff is entitled to the ability to worship in the ways of his traditional peoples beliefs and the defendants' could have given these sacred religious items back but failed to do so and ultimately they were destroyed by the staff at WMCI.

**207.** Defendant Sanders denied Plaintiff of his religious property by taking it during the 'shakedown'.

**208.** Defendants' failure to train and supervise their employees was a moving force and proximate cause of the violation of Plaintiff's constitutional rights.

**209.** The policies, customs, and practices of Wyoming Defendants, as described herein, deprived Plaintiff of his rights, privileges, liberties, and immunities secured by the United States Constitution and caused Plaintiff other damages.

**210.** As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages, and losses of sacred religious property as described herein entitling him to compensatory, punitive, and nominal damages including attorneys' fees in amounts to be determined at trial.

**211.** Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

### FIFTH CLAIM FOR RELIEF

**Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq. RFRA, and Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2).**

**– Free Exercise of Religion, Conscience and Tradition –**

(Against Defendants WDOC, WMCI, and Sanders, in his official capacity)

**212.** Plaintiff here by incorporates all other paragraphs of this Complaint as if fully set forth herein.

**213.** The Religious Freedom Restoration Act of 1993 (hereinafter referred to as the "RFRA"). 107 Stat. 1488, 42 U.S.C. 2000bb et seq., and specifically RFRA prohibits government from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden Less sweeping than RFRA, and invoking federal authority under the Spending and Commerce Clauses, RLUIPA targets two areas: "**(1)** is in furtherance of a compelling governmental interest; and **(2)** is the least restrictive means of furthering that compelling governmental interest." *City of Boerne v. Flores*, 521 U.S. 507, 515516, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997) (brackets in original) (quoting 2000bb-1). Congress again responded, this time by enacting RLUIPA. Subject the provisions of this subchapter, (RLUIPA), 114 Stat. 804, 42 U.S.C. 2000cc-1(a)(1)-(2), provides in part:

> "No govern-ment shall impose a substantial burden on the religious exercise of a person residing in or conto an institution, unless the burden furthers a compelling governmental interest, and does so by the least restrictive means."

**214.** Plaintiff at all relevant times herein was and is a current inmate of WDOC institutions operated by the Wyoming Department of Corrections and asserts that he is a Religious practitioner ("Holy Man") within the Native American Church, and similarly situated to the adherents of the Native American people's religion: The Satanist, Wicca, Asatru religions, and the Church of Jesus Christ Christian are allowed to worship in the ways of their faith.

**215.** Plaintiff complains that Wyoming's Medium Correctional Institution and Defendants herein, are in violation of RLUIPA, and have failed to accommodate to the Plaintiff's religious exercise in a variety of different ways, including retaliating and discriminating against him for exercising his Traditional Native American Beliefs/worship, denying him/them access to religious sweats for a whole year in 2023-2024, denying them the same opportunities for group worship that are granted to adherents of mainstream religions, forbidding the use and taking of his sacred religious property and eventually destroyed the plaintiff's sacred religious property, and was denied the ability to worship in the way Native Americans Belief mandates of their religion, withholding religious ceremonial items that are substantially identical to those that the adherents of mainstream religions are permitted, and failing to provide a chaplain trained in their faith during 2023-2024.

**216.** The RAFA and RLUIPA defines a "state agency" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a State or local government who receives federal funding pursuant to 42 U.S.C. 2000cc-1(a), 42 U.S.C. 1997, and Wyo. Stat. §§ 9-2-2012 and 25-1-104(b)(iv). WMCI and Wyoming Department of Corrections are each a "state agencies" within the meaning of RAFA and RLUIPA.

**217.** At all relevant times, Plaintiff is a religious practitioner with an ability to help the sick and afflicted adherents' of WMCI. The adherents are and were in need of spiritual treatment of Native American Sweat activities to help cure their plagues, and/or were regarded as having these plagues that plague them by Defendants.

**218.** Defendants were aware of Plaintiff's abilities to heal the adherents with his sacred religious property at WMCI and took and destroyed the sacred religious property.

**219.** Plaintiff, with or without reasonable modifications to rules, policies of practices, met the essential eligibility requirements for the receipt of services of the participation in programs or activities provided by the Defendants. Thus, Plaintiff was "qualified individual[s] within the

Native American Culture" within the meaning of the (RLUIPA), 114 Stat. 804, 42 U.S.C. 2000cc-1(a)(1)-(2).

**220.** Plaintiff was qualified to participate in the services, programs, activities, and benefits provided to Plaintiff and adherents' at WMCI within the meaning of ("RFRA"). 107 Stat. 1488, 42 U.S.C. 2000bb et seq.

**221.** Defendants targeted and discriminated against the Plaintiff on the basis of his race/religious beliefs of Native American Peoples. They took and destroyed his sacred religious property, and failed to reasonably accommodate other adherents' disabilities despite knowing that they suffer from a number of mental health disabilities needing the ability to worship in the Native American way e.g. Sweat.

**222.** These actions and inactions violated clearly established law under ("RFRA"). 107 Stat. 1488, 42 U.S.C. 2000bb et seq. and its implementing regulations.

**a.** While Plaintiff was incarcerated at WMCI, Defendants excluded him from participating in and denied him the benefits of the ability to worship in the Native American way. Defendants' took and destroyed his sacred religious property to conduct services or worship, and other activities by reason of his abilities to help other adherents'. Specifically, Plaintiff was excluded from these programs by reason of the religious leader who died in early 2023-2024, which halted the ability to worship in the Native American Way. This led Plaintiff and adherents being denied their ability to worship at WMCI and is a direct result of the denial to worship.

**b.** WMCI has a disproportionate burden on Plaintiff by reason of their abilities to allow him to worship in the Native American way, with his sacred religious property, but, the taking and destruction of said property, resulted in a further denial of his ability in not being able to worship how others are afforded the ability to do so, and other activities in the Native American culture.

**c.** Defendants failed to make reasonable modifications to their policies, practices, and procedures even though such modifications are necessary to avoid discriminating under the (RLUIPA), 114 Stat. 804, 42 U.S.C. 2000cc-1(a)(1)-(2).

**223.** Defendants adopted and implemented policies and practices with regard to religious services and practices available at WMCI, and that had a disparate impact on adherents with disabilities not being able to worship with Willie LeClair being gone and no other alternative.

**224.** Defendants failed to provide Plaintiff and adherents' with another alternative spiritual leader to do the sweats. Officer Beck was available and at their disposal that related to the said

services they require, by reason of not having the ability to worship in the Native American way, and to equally worship at Wyoming Medium Correctional Institution. This caused the Plaintiff's proximate harm, and Defendants' acted with the attitude of indifference that exceeded negligence to serious, known spirituality needs of adherents, and created substantial risks of serious harms in violation of Plaintiffs' right under the Fourteenth Amendment.

**225.** Defendants had no legitimate basis for violating Plaintiff's rights and Defendants engaged in these actions and inactions intentionally, willfully, and wantonly.

**226.** Because Defendants' conduct also constitutes a Fourteenth Amendment violation, Defendants Wyoming Medium Correctional Institution and Wyoming Department of Corrections are not entitled to sovereign immunity.

**227.** Defendants' actions and inactions were the proximate and legal cause of Plaintiff's injuries.

**228.** Defendants Wyoming Medium Correctional Institution and Wyoming Department of Corrections failed to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals needing to worship, in particular, Native Americans.

**229.** This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendant Sanders.

**230.** Plaintiff has suffered damages by Defendant's unlawful conduct under the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq. RFRA, and Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2), and is entitled to compensatory damages, including damages for emotional pain, suffering, and mental anguish.

**SIXTH CLAIM FOR RELIEF**

**Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2).**

**– Racial and Religious Discrimination –**

(Against Defendants WDOC, WMCI, and Sanders, in his official capacity)

**231.** Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

**232.** (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2) prohibits any qualified individual with a belief in religious sect from being excluded from the participation in, denied the benefits of, or to be subjected to religious discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. 2000cc-1(a), 42 U.S.C. 1997, and Wyo. Stat. §§ 9-2-2012 and 25-1-104(b)(iv).

**233.** Defendants Wyoming Medium Correctional Institution and Wyoming Department of Corrections are State entities receiving federal funds and are therefore subject to 42 U.S.C. 2000cc-1(a), 42 U.S.C. 1997, and Wyo. Stat. §§ 9-2-2012 and 25-1-104(b)(iv)

**234.** Plaintiff is a Native American Practitioner within the Native American Religious sect. A qualified individual with the ability to use sacred religious property to help heal adherents', as detailed herein.

**235.** Plaintiff's ability to help heal the adherents' with the use of spiritual healing in sweats etc. . . . cured some if not all of their disabilities which substantially helps them with one or more life activity, such as learning, concentrating, thinking, communicating, sleeping, and/or walking.

**236.** Wyoming Medium Correctional Institution and Wyoming Department of Corrections disregarded Plaintiff as having this ability and took the tools necessary to help him with these endeavors and destroyed the sacred religious property as a result for having done so.

**237.** Plaintiff was intentionally excluded from participation in sweats during 2023-2024 and denied the benefits of Wyoming Defendants' services, sweat activities. Plaintiff and adherents' similarly situated were denied participation in, religious services, and/or other services. The exclusions were based solely on their respective cultures religious membership.

**238.** Defendants discriminated against Plaintiff based solely on the basis of his religious beliefs that prevented him from participating in sweats like all other religious sects are afforded their worship.

**239.** Defendants adopted and implemented policies and practices with regard to religious worshiping that had a disparate impact on the Plaintiff in practicing his religious beliefs.

**240.** Defendants failed to provide Plaintiff with the special accommodations after Willie LeClair died, and related services they require, by reason of their spiritual leader being deceased, to equally access religious services at Wyoming Medium Correctional Institution.

**241.** Defendants had no legitimate basis for violating Plaintiff's rights, and Defendants engaged in these actions and inactions intentionally, willfully and wantonly.

**242.** Because Defendants' conduct also constitutes a Fourteenth Amendment violation, Defendants Wyoming Medium Correctional Institution and Wyoming Department of Corrections are not entitled to sovereign immunity.

**243.** Defendants' actions and inactions were the proximate and legal cause of Plaintiff's injuries.

**244.** Defendants Wyoming Medium Correctional Institution and Wyoming Department of Corrections failed to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, Native American individuals with religious needs and, in particular, withholding and destroying sacred religious property of the Plaintiff and denied the ability to sweat during 2023-2024.

**245.** This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendant Sanders.

**246.** Plaintiff has suffered damages by Defendants' unlawful conduct under (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2) and is entitled to compensatory damages, as permitted by law.

## CERTIFICATION AND CLOSING

**247.** Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: **(1)** is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; **(2)** is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and **(4)** the complaint otherwise complies with the requirements of Rule 11.

Charles Alfred Armajo, Jr.

## DECLARATION UNDER PENALTY OF PERJURY

**248.** The undersigned declares under penalty of perjury that he is Plaintiff in the above pleading and that the information contained in the foregoing document, is true and correct to the

best of his knowledge and believe that I am entitled to relief as a matter of law on this 27th day of February, 2025. W.S. § 6-5-301; 28 U.S.C. § 1746; 18 U.S.C. § 1621.

*Charles A. Armajo*

Charles Alfred Armajo, Jr.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and award the following relief:

1. All appropriate relief at law and equity;

2. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

3. Punitive damages on all claims allowed by law and in amount to be determined at trial;

4. Attorney fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

5. Pre-and post-judgment interest at the appropriate lawful rate;

6. Declaratory and other appropriate equitable relief; and

7. Any further relief that this Court deems just and proper, and any other relief as allowed by law and equity.

**PLAINTIFFS RESPCTFULLY REQUEST A JURY TRIAL ON ALL TRIABLE ISSUES**

**DATED**: February 27, 2025

CHARLES ALFRED ARMAJO JR.
(*PRO-SE*) #32914
**Wyoming Medium Correctional Institution**
7076 Rd. 55 F.
Torrington, Wyoming 82240
doc-wmci-court@wyo.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he mailed a true and correct copy of the foregoing petition to Office of the Clerk 2120, United States District Court, District Of Wyoming, Capitol Avenue, Room 2131, Cheyenne, WY 82001 on this 27th day of February, 2025, addressed as follows:

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**
Office of the Clerk 2120
Capitol Avenue, Room 2131
Cheyenne, WY 82001
307/433-2120

**Wyoming Department Of Corrections**
1934 Wyott Drive, Suite 100
Cheyenne, Wyoming 82002

Timothy W. Miller Bar No. 5-2704
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307)777-5820
(307)777-8920 Facsimile
Tim.miller@wyo.gov

**Charles Alfred Armajo, Jr.,**
WMCI – #32914
7076 Rd. 55 F.
Torrington, WY 82240
doc-wmci-court@wyo.gov

The undersigned also certifies that all required privacy redactions have been made and, with the exception of any required redactions, this document is an exact copy of the written document filed with the Clerk.

Charles Alfred Armajo, Jr.

Prisoners are reminded that to invoke the prison mailbox rule they must file with each pleading a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit with prison officials and must also state that first-class postage has been paid. See Fed. R. App. P. 4(c) and *United States v. Ceballos-Martinez*, 358 F3.d 732, *revised and superseded*, 371 F.3d 713 (10th Cir.), *reh'g denied en banc*, 387 F.3d 1140 (10th Cir.) cert. denied, 125 S. Ct. 624 (2004). Prisoners should also review carefully Federal Rule of Appellate Procedure 4(c)(1), which was amended December 1, 2021.





1. Charlotte Armajo Died 8·22·2024 without ever sending Armajo his transcrip as she was in Hospice living in Orem UT. my transcripts was sent to her which Should have been sent to me. She tried 3 times while being in the Hospital to get Armajo his transcri where is the Due Process.

2. Verification of Death and that I will never Recieve my transcripts because all her belonging's at the Hospital were either thrownout or lost.





| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #320 | Page 1 of 1 |
|---|---|---|
| | Inmate Communication Form | Last Revised: 12/02/16 |

EXHIBIT
1

## INMATE COMMUNICATION FORM

Inmate Name: _Armajo_          WDOC # _339ff_   Unit/Cell: _0?7f_

To: _Warden Seth Norris_        Subject: _Why Out of our Native American Chapter_

### State your problem, question or request here:

_Dear Warden Seth Norris during all this time we have had an officer that has the credentials to meet the spiritual needs of the inmates here at W.M.C.I. he is already certified officer for this place there should be some preference that should be in his favor to be considered a candidate for that position to do otherwise would be not in the interest of justice to deny him his belief and our beliefs as he knows the Traditions and the culture._

Inmate Signature _Christopher Armajo_          Date: _10-11-23_

----------------------------------------

### WDOC Response to Problem or Request:

_He can apply for the position if he chooses to do so._

☐ Request is Approved
☐ Request is Denied

WDOC Staff Signature: _____     Date: _11/12/23_
Printed Name: _Warden Norris_



| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #503 | Page 1 of 3 |
|---|---|---|
| | Establishing & Amending Faith Group Practices | Last Revised: 12/23/15 |

## ESTABLISHING & AMENDING FAITH GROUP PRACTICES

Parts I – III of this form are to be completed by the inmate desiring to establish or amend facility approval for a faith group practice, activity, or article. The form must be filled out completely and legibly. Staff will complete Part IV of this form.

EXHIBIT
2

**PART I:** Amendment
**Inmate Name:** Charles. A. Armajo Jr.    **ID #** 32914
**Facility:** W.M.C.I    **Date:** 10-9-2023

**Name of Faith Group?** Please note similar doctrines of one basic faith may be included under one faith group name. NAC / Native American Church

**Is there a recognized governing body for this faith group?** If so, provide the name, address and phone number of this body. If not, provide a source of documentation confirming the faith group's existence. yes, Arapahoe Tribe

## PART II: ESTABLISHING A FAITH GROUP PRACTICE

**What is the religious activity or property requested?** Provide both the title of the activity or property requested and a brief description of it.

I would like to get a rattels added as well a wet drum.

**What is the significance of the activity in the practice of the religion?**

it is a pratice that is like how piano's are used in church to sing and worship God or the Creator.

**How often or under what circumstances would the religious activity be held if it were taking place within the community?**

At home, at church, or in a Ceremony.



| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #503 | Page 2 of 3 |
|---|---|---|
| | Establishing & Amending Faith Group Practices | Last Revised: 12/23/15 |

**What time and physical requirements exist for this activity? Include those of any defined segment(s) of the activity.**

Any time, I would like to have it on my person so I could pratice my beliefs.

**What materials are required for this activity? What is their purpose? Would the inmate retain any of these items?**

Raw hide, hadle preferably a stick, Beads. or a goard rattel.

**Identify the title (if any), function, and eligibility requirements for participants in the activity.**

Holy Man.

**Is there any other information that would assist in evaluating this request?**

Yes. Balonga is Not A religious Diet Native Americans eat. I would like our religious meal to be changed to Buffalo Burgers with bun or Fry Bread.

**PART III: AMENDING A FAITH GROUP PRACTICE**

**What faith practice would you like to change or add?**

Holy man or Medicine man.

**Provide a detailed explanation on why this practice needs to be changed or added.**

There is so many parts to our religion and since I have been set apart for God I have been given this right to pratice my Beliefs I carry the pipe.

Offender Signature    Charls A. Ayo        Date 10.9.23



| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #503 | Page 3 of 3 |
|---|---|---|
| | Establishing & Amending Faith Group Practices | Last Revised: 12/23/15 |

**PART IV:** To be completed by Staff

**Received by Religious Coordinator:**

**Date Received**

**Recommendation(s):**

Signature: _____     Date: 1-8-24

| Date Response to Offender: | 1/8/2024 | |
|---|---|---|
| Result of Request: | Approved ☐ | Denied ☑ |

Comments: Rattles and Drums are on the Group Property Matrix (355.1). Due to this the request to have them added to the Personal Property Matrix has been denied. You may appeal this decision using a 503.1 form



| | WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #307 | Page 1 of 2 |
|---|---|---|---|
| | | Notice of Confiscation | Last Revised: 06/09/17 |

EXHIBIT
3

## PART I: NOTICE OF CONFISCATION

This form shall provide notice to the inmate identified herein that material deemed to be contraband has been confiscated by the Wyoming Department of Corrections. The inmate shall be provided a copy of this form, which shall serve as a written receipt for any items seized.

Inmate Name: Armajo Charles          WDOC #: 32914

Facility: WMCI          Date: 8/2/23

### Items Confiscated:

| Item # | Description | Qty | Reason (see back for coded reason) |
|---|---|---|---|
| 1 | Shipping Box | 1 | |
| 2 | Cedar bear paint | 1 | |
| 3 | Prayer oil | 1 | |
| 4 | Spirit Rocks | 1 | |
| 5 | | | |
| 6 | | | |

Printed Name of Staff Confiscating Contraband: Lawton Saunders

WDOC Staff Signature: _____ Date: _____

WDOC Staff Signature: Rochelle Stitt Date: 08/01/23

| Inmate Comments: _____ |
|---|
| _____ |
| _____ |
| Inmate Signature: C. Armajo      Date: 8-2-23 |

## PART II: DISPOSITION OF PROPERTY

WDOC staff shall dispose of confiscated property in accordance with WDOC Policy & Procedure #3.013, *Searches*. The above referenced inmate shall have seven (7) calendar days from the date of this form to provide the correctional facility property office with the desired disposition of the item(s) confiscated.

| Item # | Description | Reason for Disposition | Final Disposition | Staff Initial and Date | Inmate Initial and Comment(s) |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |

If the inmate can prove ownership of an item that does not present a security or safety threat, the inmate may be allowed to authorize the disposition of the property to be donated, destroyed, or mailed out at the inmate's expense.



| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #320 | Page 1 of 1 | EXHIBIT 3 |
|---|---|---|---|
| | Inmate Communication Form | Last Revised: 12/02/16 | |

## INMATE COMMUNICATION FORM

Inmate Name: Armajo Charles     WDOC # 32914     Unit/Cell: D2-117

To: Chaplin kenneddy     Subject: Religious

### State your problem, question or request here:

my Religious Items were taken during the shake down on 8/2/23 my Cermonial paint red, Cedar, prayer oil and my rattel a pill bottel filled with spirit beads in it. I request that those be returned to me ASAP.

Inmate Signature Charles. A. Armajo     Date: 8-2-23

----------------------------------------------------------------

### WDOC Response to Problem or Request:

I will check and see why they were taken. Were they labeled? (the cedar and prayer oil)
I don't have paint or rattels on my matrix, so I can't help you there.

☐ Request is Approved
☐ Request is Denied

WDOC Staff Signature: Sgt. L. _____     Date: 8.7.23
Printed Name: Kennedy





EXHIBIT
3

**Department of Corrections**

**Wyoming Medium Correctional Institution**

## MEMORANDUM

August 25, 2023

**To:** Inmate Armajo # 32914
WMCI / D-2

**From:** Jennifer Emigh
Grievance Manager

**Subject:** Grievance #23-154

**Summary:**

Your contention revolves around your religious items taken during a shakedown because the religious items were placed in empty hygiene containers.

**Investigation:**

For a response, an inquiry into this matter was conducted to include interviews and a review of documentation. After speaking with staff members, the following is the result of the conversations.

Per Policy 3.006 Property defines contraband as the following:  Contraband includes:

1.   General contraband: Any item or article which is altered without authorization, put to an unauthorized use, or taken into an unauthorized area.

**Inmate Armajo, contact WMCI Property to have your property disposed of.**

**Conclusion:**

Inmate Armajo, because of the above evidence I consider grievance #23-154 to be resolved. If desired, you may appeal to the Warden by submitting form #322 within seven days.

FOR THE DEPARTMENT OF CORRECTIONS
WYOMING MEDIUM CORRECTIONAL INSTITUTION

Jennifer Emigh
Grievance Manager

Cc: grievance files



| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #321 | Page 1 of 2 |
|---|---|---|
| | Inmate Grievance Form | Last Revised: 12/2/16 |

EXHIBIT
3

## INMATE GRIEVANCE FORM

☐ Check here if this is an EMERGENCY Grievance

Inmate Name: Armajo, Charles          WDOC # 32914

Institution: W.M.C.I.          Unit/Cell: D2-117

Date: 8-9-23          Time: 10:31 a.m.

**When completing this form, you may provide up to two (2) additional pages if necessary. The grievance filed shall meet criteria set forth in policy. You may refer to the back of this form for guidelines and instructions for filing a grievance.**

Summary of the incident or occurrence giving rise to the grievance or reason for the grievance:

I let ken addy Know that my religious Item's were Confisicated during the Shake down. As he is only able to get the prayer oil and cedar as they are on the matrix list, the ceremonial clay and prayer beads in the pill bottel he says that he cant get and I request that everything to be returned.

Summarize your attempts to informally resolve the issue (e.g. verbal discussions, submission of Inmate Communication Form, etc.)

I sent a Communicat form #320 and he responded back. I understand other religious group's are allowed their religious Item's, cathloics with the smudge for ash wensday and christians with other musical instruments. but my cermonial paint I cant have and my bottel for praise and cermonies for the Creator or God I can't have.

I request the following grievance resolution or remedy:

I request everything to be given back as this is a 1st Amendment violation of my constitutional rights. I am a Holyman and use these Item's daily. please return.

Inmate Signature: Charles M. Armajo

### Administrative Use

| Grievance Number: | 23-154 |
|---|---|

| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #322 | Page 1 of 2 |
|---|---|---|
| | Inmate Grievance Appeal Form | Last Revised: 12/02/16 |

## INMATE GRIEVANCE APPEAL FORM

EXHIBIT
4

**Grievance Directed to: (check one)**
☒ Warden/CEO (First Appeal)
☐ WDOC Director (Second Appeal)

Inmate Name: _Armajo Charles_      WDOC #: _32944_
Institution: _W.M.C.T._      Unit/Cell: _D2-117_
Date: _8-25-23_   Time: _5:26 p.m_   Grievance #: _23-154_

**Provide a clear, straightforward statement of the problem.**
**You may provide up to two (2) additional pages if necessary.**
**The appeal shall meet criteria set forth in policy. You may refer to the back of this form for guidelines and instructions for filing an appeal.**

1. My Prayer oil was in the right container but table came off because the oil had dropped all over the old table and fell off.
2. My Prayer bead's that were given to me by Mr. Little and were blessed for the use of a rattle which we don't have. "Fill bottle".
3. My Cedar was placed in my three flower container along with my Ceremonial red Paint for certain ceremonies.

**Give a description and dates of your efforts to resolve the problem by talking to staff, completing an inmate communication form, and filing an inmate grievance. Include reason(s) why the result was not satisfactory.**

I talked to Kennedy and I told the officer's that taking those Items were violating my First Amendment Right and Fourteenth Amendment Right.

**Provide a clear statement of exactly what relief or remedy is expected.**

I would like to have these Items back ASAP or I'll take this to the Court's, those Items are used for Ceremonies and that denying me of my right and Causing me emotional Stress violates my right to Practice my religious beliefs that you afford other religions and beliefs Furthermore, Bologna Is not A religious meal for Native Americans change that meal.

Inmate Signature: _Charles Armajo_

| Administrative Use | |
|---|---|
| Grievance Number: | 23-154 ~~166~~ |





EXHIBIT

4

THE STATE OF WYOMING

Mark Gordon
Governor

# Department of Corrections
## Wyoming Medium Correctional Institution
7076 Road 55F
Torrington, Wyoming 82240
Telephone: (307) 532-3198
FAX: (307) 532-3240

Daniel Shannon
Director

Seth Norris
Warden

September 15th, 2023
Inmate Armajo #32914
WMCI / D-2

Re: Grievance #23-154

     Inmate Armajo, having reviewed all pertinent information regarding the matters, I have reached a determination. Your grievance appeal is centered on the confiscation of several religious items. Unsatisfied with the response to your grievance, you have submitted a grievance appeal.

     In appeal, you state a container with religious oils in it had the label come off due to it being saturated in the oil. Additionally, you claim beads that were "given to me by Mr. Willie and were blessed" were wrongfully confiscated. Lastly, you assert cedar that was in a "three flower container" and used for ceremonies was confiscated. You claim these are violations of your First and Fourteenth Amendment rights and would like the items returned.

     For a response, I have assigned WMCI staff to investigate your concerns. My decision is based on their findings. According to the Unified Matrix for Authorized Personal Religious Property (Form #355), religious oils must be labeled with the "inmates name, number, type of oil and facility religious coordinator's initials".[1] The label was removed; this makes the bottle contraband.[2] When the label became damaged or removed, communication with the religious coordinator for a new label is necessary.

     You state beads were placed into a pill bottle and used as a rattle, which is not available at the facility. If religious property is unavailable, you must submit a request for the addition and approval to purchase the property.[3] WDOC does not allow property to be modified, or used in any manner other than the manufacturer intended.[4] This also relates to the cedar found in a container other than the container/packaging it originally was purchased in. According to form #355, all spices and herbs must be marked similarly to the religious oils, and remain in a "clear plastic bottle or bag".[5] In conclusion, I find the items were confiscated in accordance with policy and procedure. I encourage you to communicate with the property department concerning the disposition of those items.

     As such, I must deny the requested remedies written in grievance appeal #23-154. If you are dissatisfied with this response, you may appeal to the Director for a final decision within ten days per the instruction in the Inmate Communication and Grievance Procedure Policy #3.100.

---

1 WDOC Form #355 Unified Matrix for Authorized Personal Religious Property Page 3 of 3
2 WDOC Policy and Procedure #3.006 Property Control (III)(D)(1)(vi)
3 WDOC Policy and Procedure Inmate Religious Activities (IV)(G)(2) Page 20 of 31
4 WDOC Policy and Procedure #3.006 Property Control (III)(B)
5 WDOC Form #355 Unified Matrix for Authorized Personal Religious Property Page 2 of 3





THE STATE OF WYOMING

**Mark Gordon**
Governor

# Department of Corrections
1934 Wyott Drive
Cheyenne, Wyoming 82002
Telephone: (307) 777-7208
FAX: (307) 777-7479

**Daniel Shannon**
Director

January 11, 2024

Charles Armajo, #32914
Wyoming Medium Correctional Institution
7076 Road 55 F
Torrington, Wyoming 82240

RE:    Grievance Appeal

Dear Mr. Armajo:

Your appeal for religious activities was received by the Director's office on this date. A response to your appeal will be sent within the 30-day time frame in accordance with Section IV. G.3.ii. Inmate Religious Activities.

Sincerely,

JuDean Young
Executive Assistant

cc:    Warden Seth Norris
       Grievance Manager-WMCI
       Inmate File



**THE STATE**        **OF WYOMING**

EXHIBIT
5

# Department of Corrections

Mark Gordon
Governor

1934 Wyott Drive, Suite 100
Cheyenne, Wyoming 82002
Telephone: (307) 777-7208
FAX: (307) 777-7846

Daniel Shannon
Director

September 27, 2023

Charles Armajo #32914
Wyoming Medium Correctional Institution
7076 Road 55F
Torrington, WY 82240

RE: Grievance Appeal #23-154, Religious Property

Inmate Armajo,

This letter is in response to your Grievance Appeal #23-154, received September 25, 2023, regarding your religious property which was confiscated and a specific menu for the Native American religious meal because "Natives never eat this (bologna). It's not a part of our diet or religious meal." As remedy you are requesting bison burgers for the religious meal; permission to file suit for 1st Amendment, 10th Amendment and 14th Amendment violations relative to the confiscated property or immediate return of the confiscated property.

I have assigned Wyoming Department of Corrections (WDOC) employees to investigate your concerns and my decision is based on their findings. My employees personally spoke to WDOC and WMCI staff, reviewed WDOC Policy, WMCI Operational Procedures, examined the documents you provided and reviewed the grievance and first appeal responses provided. The applicable WDOC Policy and Procedure is #3.006, Property Control, which defines contraband as;

Any item or article which is not authorized by regulations of the Wyoming Department of Corrections, or a subunit thereof,[1] and;

Any item or article which is received or obtained from an unauthorized source,[2] and;

Any item or article which is altered without authorization, put to an unauthorized use, or taken into an unauthorized area,[3] and;

Any item being used for anything other than its intended purpose.[4]

---

[1] WDOC P&P #3.006, Sec III, D(1)i page 2
[2] WDOC P&P #3.006, Sec III, D(1)iv page 3
[3] WDOC P&P #3.006, Sec III, D(1)vi page 3
[4] WDOC P&P #3.006, Sec III, D(1)viii page 3

They confirmed the disputed property items include Cedar leaves, green in color, stored in a hygiene product (Tres Flores TIPO) container; Prayer Oil marked as "Egyptian Musk" with a homemade label absent of the approving Religious Coordinator's initials; and a pill bottle (Ibuprofen style), solid white and marked with a homemade label, "Spirit Rattle," containing round wooden beads, brown in color that appear to have previously been worn as a necklace or bracelet. This bottle is also absent of the Religious Coordinator's initials.

My employees validated the confiscation was as per WDOC policy, the confiscation occurred during an unannounced facility search, the property items confiscated were not authorized by WDOC regulations, may have been received or obtained from an unauthorized source, were altered without authorization and were used for other than their intended purpose. No Constitutional violations regarding this confiscation were substantiated. They further verified rattles are not an approved religious item and not listed in the WDOC Handbook of Religious Beliefs and Practices (HRBP) for the Native American faith group, or listed on WDOC Form #355, Unified Matrix for Authorized Personal Religious Property. As such, the applicable disposition is found in the same WDOC Policy, #3.006, Property Control, which specifies;

> Disposition of contraband discovered in the course of a search shall be as described in WDOC Policy and Procedure #3.013, Searches. If the item is determined to belong to the inmate and is not to be held as evidence or determined to be nuisance contraband, then the inmate shall be given seven (7) days from the notice of confiscation to designate the disposition of the item. Such property may be donated, destroyed, or mailed out at the inmate's expense. Designation of the final disposition of such property shall be indicated on WDOC Form #307, Notice of Confiscation.[5]

Regarding your request for bison burgers, rather than bologna, for the ritual meal, no dietary requirements are specified in WDOC Handbook or Religious Beliefs and Practices for the Native American faith group. The Ritual Meal specified is;

> "Native Americans may have traditional fry-bread with honey and/or Native American tacos prepared by Food Service for the Sweat Lodge ceremony closest to June 21."[6]

Therefore, after thoroughly reviewing your complaint and the findings, I hereby deny your grievance appeal, and the relief requested. Please provide direction to WMCI Property staff regarding designation for final disposition of the confiscated property.

Sincerely,

Daniel Shannon
Director

DS/MP/GH /jy

---

[5] WDOC P&P 3.006 D(6)i page 18
[6] WDOC HRBP, Native American, page 69

c:      Warden Seth Norris-WMCI
        Property Room Supervisor George Ross-WMCI
        Grievance Manager Corporal Joshua Wagner-WMCI
        Policy and Planning Coordinator G. Halter-CO
        Inmate File



THE STATE OF WYOMING



EXHIBIT
5

## Department of Corrections

Mark Gordon
Governor

1934 Wyott Drive, Suite 100
Cheyenne, Wyoming 82002
Telephone: (307) 777-5983
FAX: (307) 777-7476

Daniel Shannon
Director

February 9, 2024

Charles Armajo #32914
Wyoming Medium Correctional Institution
7076 County Road 55F
Torrington, Wyoming 82240

Re: *Religious grievance appeal*

Dear Mr. Armajo,

This is a response to your grievance received, January 11, 2024, where you are requesting a rattle and a wet drum to be authorized in-cell. You claim that it is a practice like pianos are used in church to sing and worship God or creator.

Currently the Wyoming Department of Corrections (WDOC) does allow rattles and the wet drum to be utilized via group property for group ceremonies. Allowing a wet drum and rattle to be possessed in-cell is a security concern. Allowing any items that have a potential to cause an increase in noise and disruption within housing units jeopardizes the safety and security of the institution. For example, the agency does not authorize electronics to have external speakers all electronic devices have to be accompanied by headphones in order to reduce noise volumes within the housing units.

Additionally, after consultation with the Native American tribal members they advised the rattle and wet drum are utilized for group worship ceremonies only.

Due to the aforementioned information your request for a rattle and wet drum to be possessed in-cell is denied.

Sincerely,

Daniel Shannon
Director

DS/KO/jy

cc:    Warden Norris
       Grievance Manager
       WMCI Religious Coordinator, Chad Westfall
       Inmate File



| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #320 | Page 1 of 1 |
|---|---|---|
| | Inmate Communication Form | Last Revised: 12/02/16 |

EXHIBIT 6

## INMATE COMMUNICATION FORM

Inmate Name: _Armajo_                WDOC # _32914_    Unit/Cell: _D2111_

To: _Property Manager_        Subject: _please hold on to my property till Court process is done._

**State your problem, question or request here:**

I am going to take this issue to the Courts for being denied my religious property & being taken from me and keeping me from being able to worship my beliefs.

So please hold on to this property, because it can't be replaced as item's are saved and blessed which were given to me.

Inmate Signature _Charles. A. Armajo Jr_        Date: _10-9-23_

----------------------------------------------------------------

**WDOC Response to Problem or Request:**

Your grievance was exhausted at all levels. The only way to hold your property longer is for the Courts to issue an injunction. WDOC Central office has given you an answer and follow the direction given to you by Central office

☐ Request is Approved
☐ Request is Denied

WDOC Staff Signature: _Ross_            Date: _10-11-23_
Printed Name: _____



| WYOMING DEPARTMENT OF CORRECTIONS | WDOC Form #320 | Page 1 of 1 |
|---|---|---|
| | Inmate Communication Form | Last Revised: 12/02/16 |

EXHIBIT
6

### INMATE COMMUNICATION FORM

Inmate Name: Armajo Charles    WDOC # 32914    Unit/Cell: D1-211

To: Property Sgt. Ross    Subject: Property Confiscated

**State your problem, question or request here:**

Re: WMCI Property Dept - Confiscated Item's are by definition Religious Item's used for Ceremonies Prayer oil, Spirit Beads, and Cedar/with Red ceremonial Paint - these item's were given to me by Grandpa Willie and due to the nature of him being gone these Item are irreplaceable and cant be sent to just anybody as I'm a Holy Man these Item's have spirits that are with them, if destroyed they carry karma that will be on the person(s) who destroyed them, please return them so they can be used for Religious purposes.

Inmate Signature Charles Armajo    Date: 1/2/24

------------------------------------------------------------

**WDOC Response to Problem or Request:**

These items will not be returned and you will need to Send Out at Your expense. This issu has been Grieved

------------------------------------------------------------

☐ Request is Approved
☐ Request is Denied

WDOC Staff Signature: Ross    Date: 1-4-24
Printed Name:





EXHIBIT
6

THE STATE OF WYOMING

# Department of Corrections
## Wyoming Medium Correctional Institution
7076 Road 55F
Torrington, Wyoming 82240
Telephone: (307) 532-3198
FAX: (307) 532-3240

Mark Gordon
Governor

Daniel Shannon
Director

Seth Norris
Warden

Date: 12-27-2023

Inmate Name & WDOC #:  Armajo 32914 (D-1)

From: WMCI Property Dept.

RE: Confiscated Items:

Description of Confiscated Items:  Prayer Oil, Spirit ~~Rocks~~ Beads, Altered Hair Gel Container

This is your notice that you have 30 days to communicate a disposition for your confiscated item(s) to the Property Department. You may choose to request for the item(s) to be destroyed or mail the item(s) out at your expense. You will need to reply by using Form 352- Property Disposition Form and a 160.1 Financial Transaction Form or as policy 3.006 states; the items listed above will be disposed of after the 30 day expiration. It is your responsibility to mail a response back to the WMCI property Department within the time frame you have been given. Property that is deemed to be **NOT** yours will **NOT** have an option of mailing out. The property will be destroyed.

Inmate Signature:

Date:





**GENERAL SERVICES DIVISION**

*Mark Gordon,* **Governor** | *Patricia L. Bach,* **Director** | *Andrew Kuhlmann,* **Administrator**

**ADMINISTRATION & INFORMATION**

February 18, 2025

Charles Alfred Armajo Jr., #32914
Wyoming Medium Correctional Institution
7076 Road 55F
Torrington, WY 82240

Re:    State Claim No:      080-EO-24-0012878
       Date of Loss:        08/02/2023
       Location:            Wyoming Medium Correctional Institute

Dear Mr. Armajo,

This office received your documentation for an allegation of religious discrimination when your religious items were confiscated.

This office has reviewed the information related to the above referenced claim number. After reviewing the information for this matter, it has been determined the claim does not have merit, and the State Of Wyoming has no liability in this matter. Therefore, your claim has been denied.

Sincerely,

The State Risk Management Section



Department of Administration and Information
General Services Division
Risk Management Section
2800 Central Avenue
Cheyenne, WY 82002
(307) 777-6774/(307) 777-6796
*ai-riskmanagement@wyo.gov*

## CLAIM FORM

Per Wyoming Statute § 1-39-113, the following information must be completed to properly file a claim against the State of Wyoming. All claims must be filed within two (2) years of the alleged act, error or omission.
Please complete this form in entirety and submit the <u>original</u> to A&I Risk Management.
FAXED or EMAILED SUBMISSIONS WILL NOT BE ACCEPTED.   Keep a copy for your records.

1. CLAIMANT'S NAME: Charles Alfred Armajo, Jr.

   MAILING ADDRESS: W.M.C.I. 7076 Rd. 55 F.

   CITY, STATE, ZIP CODE: Torrington, Wyoming 82240

   CONTACT PHONE: _____

   EMAIL ADDRESS: _____

   ...................................................................................................

   CLAIM FILED, OR WILL BE FILED WITH YOUR INSURANCE COMPANY: ☐ YES  ☐ No

   Claim Number (if applicable): _____

   IF ABOVE CLAIMANT IS AN INSURANCE COMPANY:

   Name of Insured: _____

   Claim Representative: _____  Claim Number: _____

2. DATE OF OCCURRENCE: 08/02/2023 _____  TIME OF OCCURRENCE: 1:00 ____ ☐ AM ☒ PM

3. LOCATION (include as much information as possible): I was living in D block 2, room # 117

   City or Town: Torrington, Wyoming 82240 ____ ☐ In ☒ Near 4 miles _____ (miles to/from)

   Highway or Street Name: W.M.C.I. 7076 Rd. 55 F.

   State Building (if applicable): Wyoming Medium Correctional Institution

4. NAME OF PUBLIC EMPLOYEE INVOLVED (IF KNOWN):

   Officer, Landen Sanders

5. THE AMOUNT OF COMPENSATION OR OTHER RELIEF DEMANDED: $ 1,500,000.00

   In addition, please **provide two estimates for property damage repairs and/or any invoices to support your demand.**

6. **PLEASE PROVIDE A COMPLETE DESCRIPTION OF THE CIRCUMSTANCES OF THE ALLEGED LOSS OR INJURY.** Include as much detail as possible, with any applicable supporting documentation attached.

On 08/02/2023, W.M.C.I. conducted its routine six month matrix search. During this search Officer Landen Sanders took away Armajo's religious items that were given to him by WDOC's Native Spiritual Leader Willey LeClair whom is now deceased, making these items irreplaceable.

Officer Landen Sanders took Armajo's shipping box that the Cedar, ceremonial red paint, prayer oil, and spirit beads came in, denying Armajo his First Amendment right to freedom of religion.

Armajo uses these items to worship God, whom is Jesus Christ, and told Officer Landen Sanders that taking his religious items was preventing him from worshiping.

The Officer did not check to see if these items were blessed and sacred which was done for Armajo before Willey LeClair died.

Armajo had grieved this issue through Communication Form #320, then filed his grievances to the manager. The manager denied relief. Armajo then appealed to the Warden and he also denied relief. Finally Armajo appealed to Daniel Shannon who also denied relief for the religious item which in no way harms the safety, security, or wellbeing of the facility.

Discriminating against Armajo on the basis of his religion, the property supervisor threw away Armajo's religious items and discarded the sacred items in the trash. Sacred items should not be treated this way.

They have not done this to anyone else's religious items as far as Armajo knows, but, they did it to Armajo as retaliation for filing his Appeal, challenging his conviction to the Tenth Circuit Court.

I, Charles Alfred Armajo, Jr. _____, have read and understand the provisions of the false swearing statute. I hereby certify under penalty of false swearing that the foregoing claim, including all of its attachments, if any, is true and accurate.

_Charles A. A_____ 1-15-2025
Signature of Claimant    Date

_Charles H. Armajo, Jr._
Printed Name of Claimant

*********************************************************************************

State of  Wyoming )
                              ) SS
County of  Goshen )

Subscribed and sworn to before me, a Notarial Officer on this 15th day of January, 2025.

_____
Notarial Officer

LEONARD D. WYATT
Notary Public - State of Wyoming
Commission ID 167716
My Commission Expires OCTOBER 24 2028

My Commission expires  October 24, 2028.

(Seal)

# CIVIL COVER SHEET

This civil cover sheet and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form, approved by the Wyoming Supreme Court, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM)

**I. CAPTION**

**CHARLES ALFRED ARMAJO JR**;
On behalf of other Native American Adherents' similarly situated in WDOC's custody;
Plaintiffs,
**Current Address:** WMCI #32914 7076 Rd. 55F.
Torrington, Wyoming 82240

Docket #: _____

**v.**

**WYOMING DEPARTMENT OF CORRECTIONS;**
**WYOMING MEDIUM CORRECTIONAL INSTITUTION;**
**DIRECTOR DANIEL SHANNON;**
**WARDEN SETH NORRIS;**
**LANDEN SANDERS;**
Defendant(s).

**II. NATURE OF SUIT** *(Place an "X" in One Box Only)*

## GENERAL CIVIL

### CONTRACT
- ☐ Business Organization Litigation
- ☐ Com. Const. Contract Litigation
- ☐ Contract Other (not Debt Collection)

### TORT
- ☐ PI or WD - Environmental or Toxic Tort
- ☐ PI or WD - Fed Employer Liability Act
- ☐ PI or WD - Medical Malpractice
- ☐ PI or WD - Product Liability
- ☐ PI or WD - Vehicular
- ☐ Personal Injury Unspecified
- ☐ Wrongful Termination of Employment
- ☒ Tort (RFRA), 107 Stat. 1488, 42 U.S.C. 2000bb et seq.
- ☒ Tort (RLUIPA), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2)

### CIRCUIT COURT
- ☐ Small Claims
- ☐ Forcible Entry and Detainer
- ☐ Stalking Protection Order
- ☐ Family Violence Protection Order

### DISSOLUTION OF MARRIAGE
- ☐ Divorce w/Minor Children
- ☐ Divorce w/o Minor Children
- ☐ Judicial Separation
- ☐ Annulment

### DOMESTIC RELATIONS
- ☐ Custody/Parental Visitation
- ☐ Grandparental Visitation
- ☐ Paternity
- ☐ Child Support/Parental Contribution
- ☐ Child Support w/Paternity
- ☐ UIFSA w/Paternity
- ☐ UIFSA
- ☐ Dom Register Foreign Judgment
- ☐ TPR State DFS
- ☐ TPR Family Private

### PROPERTY
- ☐ Property with Mineral Rights
- ☐ Property w/o Mineral Rights

### PROBATE
- ☐ Ancillary Admin/Foreign Prab
- ☐ Decree of Title Distribution
- ☐ Determination of Heirship
- ☐ Letters of Administration
- ☐ Estate Unspecified
- ☐ Summary
- ☐ Testate/Interstate Estate
- ☐ Will Only Filings
- ☐ Trust Matters
- ☐ Guardianship
- ☐ Conservatorship
- ☐ Guardian & Conservatorship

### ADOPTION
- ☐ Adoption
- ☐ Confidential Intermediary

## OTHER CIVIL
- ☐ Appointment/Removal of a Fiduciary
- ☐ Arbitration Award Confirmation
- ☐ Birth Certificate Amendment/Establishment
- ☐ Debt Collection
- ☐ Declaratory Judgment
- ☐ Emancipation of Minor
- ☐ False or Frivolous Line
- ☐ Foreign Judgment
- ☐ Foreign Protection Order/Foreign Stalking Order
- ☐ Forfeiture of Property
- ☐ Governmental Action Environmental Case
- ☐ Injunction
- ☐ Material Witness/Foreign Subpoena
- ☐ Name Change
- ☐ Involuntary Hospitalization
- ☐ Public Nuisance
- ☐ Specific Relief
- ☐ Structured Settlement Protection Act
- ☐ Successor to Civil trust Appointment
- ☐ Transcript of Judgment from Circuit Court
- ☐ Writ of Habeas Corpus
- ☐ Writ of Mandamus
- ☒ § 1983, Title 28, U.S. Code, section 1343(3)
- ☒ § 1997 civil rights violations

**III. RELATED CASE(S) IF ANY** *(see instructions)*

Docket No. _____ Judge _____ Court (if different) _____

Docket No. _____ Judge _____ Court (if different) _____

**IV. AMOUNT IN CONTROVERSY (estimated)** *(see instructions)*
$1,500,000.00

_Charles A. Armajo Jr_ _____        02/27/2025 _____
SIGNATURE OF ATTORNEY OF RECORD OR PRO SE LITIGANT                DATE

Charles Armajo #32914
WMCI 7076 Rd. 55F.
Tairington, Wy 82240

THIS IS AN UNCENSORED LETTER
FROM AN INMATE AT THE WYOMING
MEDIUM CORRECTIONAL INSTITUTION

United States District Court
District of Wyoming
office of the Clerk 2120
Capitol Avenue, Room 2131
Cheyenne, Wy 82001





US POSTAGE
PAID ®
03/07/2025
From 82240
Cubic .10
Zone 2

Pitney Bowes
CommPrice
NO SURCHARGE

028WM\02310123
9G34682407

**USPS GROUND ADVANTAGE™**

Inmate Armajo #32914
WMCI
7076 Road 55F
Torrington WY 82240-7771

0001

C015

U.S. DISTRICT COURT
OFFICE OF THE CLERK 2120
ROOM
2131 CAPITOL AVE
CHEYENNE WY 82001-3619

USPS TRACKING #

9434 6091 0515 6120 2334 00



WY DEPT OF CORRECTIONS
WMCI MAILROOM
MAR 0 6 REC'D
RECEIVED